**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4560**

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

NATHAN SHANE WOLF,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Graham C. Mullen, Senior District Judge. (3:12-cr-00239-GCM-DCK-16)

Argued: December 7, 2016                    Decided: June 19, 2017

Before NIEMEYER, TRAXLER, and HARRIS, Circuit Judges.

Affirmed by published opinion. Judge Traxler wrote the opinion in which Judge Niemeyer and Judge Harris joined.

**ARGUED:** Mark Patrick Foster, Jr., RAWLS, SCHEER, FOSTER & MINGO PLLC, Charlotte, North Carolina, for Appellant. Maria Kathleen Vento, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Jill Westmoreland Rose, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

TRAXLER, Circuit Judge:

Nathan Wolf was convicted by a jury on three counts stemming from a mortgage fraud conspiracy occurring between 2005 and 2007: conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), *see* 18 U.S.C. § 1962(d); bank fraud, *see* 18 U.S.C. § 1344; and conspiracy to launder money, *see* 18 U.S.C. § 1956(h). The district court imposed a term of 84 months imprisonment after granting Wolf a downward variance of ten levels. Wolf appeals, challenging both his conviction and sentence on various grounds. As explained below, we affirm.

## I.

Before and during the conspiracy for which Wolf was charged, tried and convicted, Wolf was a licensed real estate agent and broker in North Carolina. During the licensure process, Wolf was required to complete various real estate courses during which he was instructed that "a real estate agent [is not] allowed to pay someone for referring a buyer if that person is not licensed," J.A. 459; that a real estate agent commits loan fraud "by misleading the lender by . . . either misrepresenting information or withholding information in order to obtain a loan that is larger than the lender might ordinarily make," J.A. 462; and that unlawful "[c]ontract kiting" occurs when "one contract . . . for sale between the seller and buyer . . . is provided to the lender [with] one price," while "[a] second contract [with a lower price] is prepared between the seller and buyer *but is not provided to the lender*. The higher priced contract goes to the lender so [that] the lender will make a higher loan, but the . . . contract they actually enforce . . . is the one with the lower amount so that the buyer does not have to come up with as much

2

down payment." J.A. 463 (emphasis added).  In these required courses, Wolf would have also learned that a broker is responsible for attending the closing and reviewing the accuracy of the Housing and Urban Development Settlement Statement ("HUD-1"), and that federal law "prohibit[s] certain kickbacks for settlement services."  J.A. 469.  Additionally, licensed agents are "prohibited . . . [from] misrepresent[ing] any material fact to any party . . . [i]ncluding the lender."  J.A. 482.

*Co-conspirators' testimony about Wolf's involvement in fraudulent real estate deals*

At trial, the government presented evidence that Wolf was involved in a series of fraudulent real estate transactions in his capacity as a licensed broker.  The government's evidence consisted primarily of testimony from Wolf's co-conspirators.  Mark Wittig, a residential builder and the owner of Touchstone Homes, testified that he partnered with Wolf on 14 or 15 transactions.  According to Wittig, Wolf created a scheme whereby Wittig would build a house and then reach an agreement with a buyer as to its price, as he normally would in any sales transaction.  This agreed-upon price, to which Wolf referred as the "strike price," J.A. 256, roughly reflected fair market value.  That is, the "strike price" was the "the actual price of the house" the buyer agreed to pay.  When it came time to list the property for sale, however, Wolf would "list the house at an inflated price," J.A. 250, which Wolf termed the "gross price" or "bank price," J.A. 259, because the inflated price was used in the sales contract and closing documents provided to the mortgage lender.  Thus, the loan value was based on the inflated "gross" price, and the "gross" price was reflected on the HUD-1.  J.A. 259-60.  The difference between the strike price and the gross price would go back to the buyer as a kickback.  Wolf also told

3

Wittig that the kickback "money would go back to the buyer in a company's name." J.A. 262. Wolf directed every aspect of the scheme. Not only did Wolf list Wittig's houses, but he was involved in the design of the houses and even sent Wittig the plans on numerous occasions. Wolf advised Wittig to build "box style" two-story houses rather than "a sprawling ranch" so "there would be more money at the end for a kickback to the buyer." J.A. 263-64. Although Wittig did not make any extra money from the kickback scheme, he participated in the scheme because Wolf provided guaranteed buyers for his homes.

One such guaranteed buyer brought in by Wolf was Waylon Long. Long was introduced to Wolf by a college fraternity brother who had already participated in the kickback scheme. Wolf identified several properties for Long and gave Long the expected compensation that would be paid after closing; if Long "liked [the] numbers," they would "move forward with [the] transaction." J.A. 387.

Long's first purchase from Wittig with Wolf serving as a dual agent was a house at 2900 Crane Road in Marvin, North Carolina. Wolf drafted a sales agreement between Long as the purchaser and Touchstone Homes as the seller, which contained a merger provision indicating that the sales agreement contained "the entire agreement" between the parties. J.A. 254. According to the sales agreement that was given to the mortgage lender, Long was purchasing the property for $1,350,000, a figure that Wolf determined. Wolf was listed a dual agent for the transaction. In addition to the sales agreement, Wolf also drafted a "compensation agreement" between Long and Wittig that referred to both the actual or "strike" price of the house ($765,000) and the inflated or gross price

4

($1,350,000), as well as the $585,000 Long would be receiving at closing, which was "the difference between the gross price and the strike price." J.A. 391. The compensation agreement, however, indicated that Advantage Investor Enterprises, LLC, a company owned by Long, would be receiving the $585,000 instead of Long himself. The compensation agreement, therefore, stated that "Advantage Investor Enterprises shall receive for construction design services $585,000," J.A. 389, even though the company performed no services or work of any kind in connection with the construction of the house at 2900 Crane Road. Long testified that Wolf told him the HUD-1 settlement statement could not reflect that money was going to him individually but instead "a company had to be created in order to receive those funds at closing." J.A. 389. Finally, the HUD-1 form provided by Wolf for the purchase of 2900 Crane Road listed the purchase price as $1,350,000—Wolf's inflated gross price, and it falsely indicated that Long was receiving $2,604 at closing.

Long purchased a second house built by Wittig's company. Wolf brokered the transaction and drafted the sales and compensation agreements, just as he had done for Long's purchase of 2900 Crane Road. According to Long, "the process" for the second transaction "was pretty much identical" to the first one, resulting in another "big kickback" for Long. J.A. 396. For these two transactions combined, Wolf took commissions totaling about $100,000.

In addition to receiving funds for serving as a buyer, Long, who was not a real estate agent, received a "fee for bringing [borrowers] to the table," J.A. 396, *i.e.*, for recruiting buyers. One buyer Long recruited was Benjamin Clarke, a former mortgage

5

loan officer, who testified that he "was looking to get cash back at closing or a seller kickback." J.A. 422. In Clarke's first deal, he received a kickback of $67,559 for purchasing a house at 9609 Tralee Court. The HUD-1 settlement statement showed a gross purchase price of $556,000, which had been set by Wolf, and showed design fees of $67,559 going to First Capital Development Corporation. According to Clarke, Wolf asked for a company name to use for the HUD-1 form. Clarke told Wolf to use Clarke's company, First Capital, even though First Capital performed no services whatsoever in connection with 9609 Tralee Court. Clarke further testified that Wolf gave him a compensation agreement, describing it in terms similar to those used by Long. Based on Clarke's experience in the mortgage industry, he "was aware that [the transaction] was something that [he] shouldn't do." J.A. 428. Clarke testified that the bank was unaware "that money was being paid to [Clarke] as the buyer" and that "[t]he bank would not approve a loan where money is going to a company that I own if I'm the buyer." J.A. 428-29. The closing documents reflected that Wolf earned $22,000 for the deal.

Wolf brought a property to Clarke for his second purchase, which was structured the same way as his first purchase. Clarke decided to serve as the buyer because Wolf told him he "could get around [$]150,000 out of it at closing." J.A. 430. Clarke was supposed to bring $40,000 to the closing as the purchaser, but he did not have the money. Wolf arranged for Brighton Developers to send the money to the closing attorney. Once again, Wolf determined the gross purchase price to be given to the lender. Long's company, Advantage Investors, received $70,000 in the deal as well. Ultimately, as

6

reflected in an email from Wolf to the closing attorney, First Capital (Clarke's company) received $180,000 as part of the transaction.

Wolf also recruited Ralph Johnson, who testified that "[Wolf] would have some properties that he needed to be sold. He would come to me. We would discuss an amount that he wanted to net," and "[a]nything above that amount would come to me and my company." J.A. 487. Johnson indicated that he "purchased homes," "forged some documents," and "[l]ied on the amount that [he] made . . . [and] the work that was done through [his] company." J.A. 486-87. According to Johnson, Wolf provided a compensation agreement for "any transaction I've done with [him]." J.A. 488. Johnson testified that he created a shell company called Pinnacle Investments "[j]ust to receive monies from the purchases of homes," J.A. 488, because "[t]hat's the only way the lender would sign off on the loan, that work was done and that there was a reason for you to be receiving this type of money," J.A. 490. Johnson indicated that he even used straw buyers such as Damali Neal, who allowed Johnson to use "all of her pertinent information as far as driver's license, social security" to purchase the properties. J.A. 491. Johnson estimated that during these deals with Wolf, the amounts he received "varied from fifty thousand to some hundred, two hundred thousand." J.A. 496. Johnson explained that after the closings, "we . . . tried to put tenants in [the homes]" and "[t]ake care of the mortgage[s]." J.A. 496. And, Johnson testified that he and Wolf discussed how important it was that the homes not go into foreclosure because that would bring the "feds" or "[p]olice" or "heat on us. They would have people looking at us as to why those houses are foreclosing." J.A. 497.

7

Wittig noted several other similar transactions he made with buyers recruited by Wolf. One buyer was Denetria Myles, who purchased a home from Wittig located at 1044 Antioch Woods Drive. Myles' compensation agreement indicated that Jimario Dyson and New Vision, a company created by Myles, would be receiving $79,000 for services rendered, even though, according to Wittig, neither Dyson nor New Vision did any work related to the property. The HUD-1 listed the gross price, which had been inflated from the actual price by Wolf, and indicated that Myles was actually paying rather than receiving money at the closing. Wolf received a commission of $15,000 for the transaction.

Nina Maiden was another buyer of a house built by Wittig. The HUD-1 settlement statement for the house at 9215 Woodhall Lake Drive, reflected a purchase price of $2,100,000, as well as a $594,950 payment to Brighton Developers for work which, according to Wittig, was never done. Although the HUD-1 also indicated that Maiden was bringing $215,000 cash to the closing as a down payment, Maiden admitted at trial that she did not bring any money to the closing. The down payment was actually provided by Brighton Developers, a shell company used by members of the conspiracy "to fund fraudulent mortgage transactions" and "to receive and distribute the proceeds from such mortgage frauds."[1] J.A. 34. Wolf served as the real estate agent and took a $55,000 commission.

---

[1] According to Victoria Hunt, who was paid by Brighton Developers to bring in "investors," Brighton Developers obtained the cash for the down payment from a handful (Continued)

8

Victoria Hunt, who was associated with Brighton Developers, also helped to fund a $183,000 down payment on a home at 2817 Cutter Court that was purportedly being purchased by Jamaine Wallace. Wolf attended the closing and received a commission of about $11,000. Hunt and Wallace were among those receiving kickbacks through Charlotte Business Investor Group and other entities such as Stir, Inc., a nightclub, that did not perform any work on the property.

Danielle Vaughn, a mortgage broker who obtained loans for some of Wolf's buyers, confirmed that Maiden obtained a loan for 9215 Woodhall Lake Drive and that Wallace secured a loan to purchase 2817 Cutter Court. Maiden's loan application was referred to Vaughn by James Tyson, one of Brighton Developers' principals. Vaughn testified that she was aware that Hunt, not the purchaser Wallace, brought the required cash to the closing for 2817 Cutler Court. Vaughn also testified that Wolf instructed her that there were some documents "he [did] not want to go to the underwriter," including the compensation agreement. J.A. 658.

*Testimony of government's expert witness on mortgage-lending practices*

Before trial, Wolf filed a motion in limine to exclude the testimony of Dr. Debra Sherrill, the government's expert witness on the mortgage industry, the mortgage-lending process and typical lender practices. Wolf argued that the district court should exclude Dr. Sherrill's testimony as "irrelevant" and "beyond the scope of evidence permissible

---

of professional football players who believed they were investing in a real estate project and that their investment was "secured by a lot." J.A. 224.

under Fed. R. Evid. 702." J.A. 112. Wolf believed that such testimony was too general and that "[o]nly an authorized representative of each lender" should be allowed to testify based on "personal knowledge" as to what information "that lender would have considered . . . material in its underwriting decision back in 2006-2007." J.A. 112. In response, the government argued that "the test for whether a false statement to a bank is material is an *objective* one." J.A. 115. Additionally, the government suggested to the court that "[e]xpert testimony is an efficient and appropriate way of helping the jury to understand the basics of obtaining a mortgage loan . . . and helping the jury understand what would be important to a reasonable lender." J.A. 116. The district court agreed that Dr. Sherrill could testify and denied the motion.

Dr. Sherrill, a professor who taught mortgage banking and had 20 years experience in mortgage processing and underwriting, explained to the jury how residential real-estate transactions work. First, Dr. Sherrill testified that the "sales price is the agreed upon price that the buyer agrees to pay for that house," and that "the seller agrees to sell the house for." J.A. 153. Dr. Sherrill testified that "the lender [makes] a determination of how much to loan," "based on that sales price." *Id.* She explained that down-payment money "represents the buyer's equity," J.A. 155, and that it "[a]bsolutely" matters to the lender whether or not the buyer is really putting the down payment money down, J.A. 156.

When asked how would it "affect the appraisal if there were a large amount of money being paid from the seller to the buyer," Dr. Sherrill explained that the appraiser "would have to lower the amount of the appraisal." J.A. 161. According to Dr. Sherrill,

10

lenders only allow sellers to pay buyers a certain amount of cash—usually three to six percent of the contract. If the seller were to exceed this limit, the lender "would automatically lower that value and then make a loan amount determination based off the lower value." J.A. 162. Dr. Sherrill further confirmed that all information supplied by a prospective buyer on the Uniform Residential Loan Application matters to the lender so that it can determine the buyer's "capacity to repay." J.A. 164.

Finally, Dr. Sherrill explained that the Real Estate Settlement Procedures Act (RESPA) requires the use of the HUD-1 settlement statement which must list "[e]very fee connected to a residential real estate transaction," J.A. 167, including "the real sales price," any "deposit or earnest money," and "cash at settlement from or to [the] borrower." J.A. 168. And, she explained that "[y]ou cannot have any fee on this HUD-1 that is not earned" and that "whatever that fee is, the person had to [have] perform[ed] that work." J.A. 171.

*Testimony of Wolf's real estate closing attorney*

Christine Gates, a real estate attorney who was involved with Wolf in several fraudulent transactions, testified that she received compensation agreements reflecting a gross price and a strike price. She never disclosed these agreements to the lenders, however, because she "knew that the bank[s] . . . wouldn't do the loan[s]." J.A. 734. Gates testified that she and Wolf never discussed whether "it was legal to structure a real estate deal this way, to have two prices" in "a compensation agreement." *Id.* Gates likewise indicated that she never told Wolf "that it would be legal for buyers to receive money so long as they used a company name instead of their own name on the HUD-1."

11

J.A. 735. Gates further explained that the bank would not have approved the loan if it had been told the strike price "because the difference [between the gross and strike prices was] going out to a third party [that] had nothing to do with the properties." J.A. 733.

*Wolf's testimony*

After the government rested, Wolf testified in his own defense. Wolf claimed that he sought the advice of a lawyer to ensure that his way of structuring transactions was legal, suggesting that he was going to pursue an advice-of-counsel defense. Wolf claimed that he consulted an attorney named Dale Fussell, who actually prepared the compensation agreements Wolf used in his transactions. Wolf testified that he "fully disclose[d] to [Fussell] . . . the details of the transaction . . . to be used in the compensation agreement," and that, based on his consultation with Fussell, he understood his approach "was acceptable." J.A. 828. He further claimed that "[a]ny time anybody . . . wanted any disbursements on a HUD-1 settlement statement," Wolf would have the closing attorney "go over how they wanted their transaction to transpire at the closing," as well as "the compensation agreement . . . to make sure we were making full disclosure [on the HUD-1]." J.A. 831. Wolf additionally testified that he used the compensation agreements "to disclose to the attorney and to the lender and to disclose between the parties [how] the monies . . . [were] being distributed" and claimed the compensation agreements were provided to the lending institutions. J.A. 830. Wolf acknowledged that he went through training as a real estate agent. He testified that RESPA applied to "government insured loans," but not "commercial or investor purchase[s] of real estate."

12

J.A. 829. Wolf indicated that "it was the responsibility of the attorney," rather than the real estate agent, "to ensure that [the HUD-1] was complete and accurate." J.A. 828.

Wolf then testified about a number of individual transactions, offering his explanation to contradict the testimony of the government's parade of witnesses. For each transaction he addressed, Wolf denied setting the price of the house, stated the house was worth the purchase price, recited his commission for the transaction, and denied "there was anything fraudulent about [the] transaction." J.A. 842. Moreover, when asked about the large sum going to a designated company—at closing—for various services rendered, Wolf testified the money was for work that needed to be completed. For example, Wolf testified that Wittig, the builder, set the gross price of $1,350,000 for the 2900 Crane Road property purchased by Long. According to Wolf, the house was initially listed at $1,050,000 before it was built, but Wittig asked Wolf to raise the listing price to $1,350,000 after it was completed. When questioned about the $585,000 sum to be disbursed to Advantage Investor Enterprises for "[d]esign service fees," Wolf asserted that "the house was not exactly complete and there were additional landscaping and other things that needed to occur and . . . basically [the $585,000] allow[ed] the buyer to dictate who would complete the project." J.A. 839.

Finally, Wolf denied "reach[ing] any kind of agreement [with any of his co-conspirators] to purposely misrepresent things to lenders" or "conspir[ing] . . . to commit fraud," J.A. 915, but agreed "some people may have" "engaged in fraud in the transactions of which [he was] a part." J.A. 920.

13

After Wolf rested, the government called Fussell, the attorney, in rebuttal. Fussell testified unequivocally that he did not draft the compensation agreement, or anything like it, that had been used in the transactions at issue. Fussell likewise testified that he never gave Wolf advice "on how to structure transactions so that money could go back to companies owned by buyers," J.A. 965, because such a transaction would be illegal. Fussell also indicated that he did not know the terms gross price, strike price, or "construction design services," which were frequently used in connection with Wolf's real estate transactions, J.A. 966-67.

At the close of the government's evidence and at the conclusion of all of the evidence, Wolf unsuccessfully moved for judgment of acquittal. The jury found Wolf guilty of all counts.

*Sentencing*

In calculating the advisory Guidelines range, Wolf's presentence report ("PSR") started with a base offense level of 7 pursuant to the guideline for fraud offenses, *see* U.S.S.G. § 2B1.1(a)(1)[2], then made the following adjustments based on applicable specific offense characteristics: a 20-level enhancement for a loss between $7 and $20 million, *see* U.S.S.G. § 2B1.1(b)(1)(K); a two-level enhancement for more than 10 victims, *see* U.S.S.G. § 2B1.1(b)(2)(A)(i); a two-level enhancement for use of sophisticated means, *see* U.S.S.G. § 2B1.1(b)(10)(C); and a two-level enhancement for a

---

[2] The PSR grouped Counts 1, 3 and 5 together for purposes of calculating the guidelines. *See* U.S.S.G. § 3D1.2(d).

conviction under 18 U.S.C. § 1956, *see* U.S.S.G. § 2S1.1(b)(2)(B). The PSR then recommended the imposition of a three-level manager or supervisor enhancement, *see* U.S.S.G. § 3B1.1(b); a two-level enhancement for abuse of a position of trust, *see* U.S.S.G. § 3B1.3; and a two-level obstruction-of-justice enhancement, *see* U.S.S.G. § 3C1.1. Thus, the PSR's adjusted offense level was 40. Wolf objected to the enhancements based on loss amount, number of victims, role in the offense, sophisticated means, abuse of a position of trust, and obstruction of justice. The government did not pursue the obstruction enhancement at sentencing.

The district court adopted all of the PSR's recommended enhancements except the two-level obstruction-of-justice enhancement. Thus, the district court determined Wolf's total offense level was 38, which, when coupled with his criminal history category of I, yielded an advisory guideline range of 235 to 293 months.

Wolf moved under 18 U.S.C. § 3553(a) for a significant downward variance "to a sentence of less than 36 months imprisonment." J.A. 1633. The government likewise requested a downward variance, but a much more modest one. The government asked that the district court vary downward from the advisory sentencing range of 235 to 293 to a range of 121-151 months. The district court granted the motion for a downward variance and imposed a sentence of 84 months imprisonment.

*Post-Trial Motions*

*A.*

After trial, Wolf filed a motion for new trial and a renewed motion for acquittal. Wolf claimed that he had come into possession of a "compensation agreement that was

15

not included in the discovery provided by the government and which was not part of the evidence presented at trial," J.A. 1167, although Wolf conceded that he had the document in his possession a week before trial. Specifically, Wolf asserted that this compensation agreement was very similar to those presented at trial, included the terms "gross price" and "strike price," and was signed by Fussell in his capacity as an attorney. Accordingly, Wolf contended that this document contradicted Fussell's testimony that he was unfamiliar with the meaning of the terms "gross price" and "strike price." J.A. 1167. Wolf also renewed his Rule 29 motion for acquittal, arguing that "there was a lack of evidence from which the jury could have found beyond a reasonable doubt that the alleged representations or misrepresentations would have been important to a reasonable lender." J.A. 1172.

The district court held an evidentiary hearing on the motion for a new trial. At the hearing, Fussell agreed that his signature appeared on a number of compensation agreements, that the compensation agreements contained the terms "gross price" and "strike price," and that the compensation agreements indicated that payments were going to various companies. Fussell, however, reaffirmed his position at trial that he did not know what those terms meant or who owned the companies named in the compensation agreements or what they did. Fussell testified further that he had never prepared such an agreement that would "kick[] money back to a buyer," J.A. 1262, because "that is mortgage fraud," J.A. 1266. Fussell also testified that he did not "have a recollection of [Wolf] or these closings," which had occurred 10 years earlier and amounted to four out of 1,000 closings Fussell did annually. J.A. 1261. Finally, Fussell denied that Wolf ever

16

asked him "how to make sure that he could legally get money to go back to a company owned by a buyer." J.A. 1266.

The district court denied Wolf's motion for new trial, concluding "that the evidence at trial, absent the testimony of Mr. Fussell, was more than adequate to have the jury return the verdict that they did." J.A. 1275. Further, the district court found that the evidence relied upon by Wolf did not constitute "newly discovered evidence." *Id.* And finally, the district court found that Fussell had not perjured himself at trial or during the hearing, as he "clos[ed] a thousand loans a year" and could not reasonably be expected to "uncover this fraud." *Id.*

### B.

Eight months after the trial, the government filed an ex parte motion to disclose material pursuant to a protective order. The government revealed that on December 6, 2013, about two months after the conclusion of Wolf's criminal trial, a "grand jury investigation involving possible 'short sale' fraud" was opened, and the Assistant United States Attorney handling the new grand jury investigation learned that Fussell "served as the closing attorney for most of the approximate[ly] 100 short sales under investigation." J.A. 1424. Furthermore, the government indicated that the new investigation uncovered "two facts which have made Attorney Fussell a subject of such investigation": (1) that "Attorney Fussell has signed a document certifying to the bank that [he] knew of no subsequent contract or arrangement to sell property, when in fact it appears that . . . Attorney Fussell did know of a subsequent transaction;" and (2) that the mother of one of the targets of the investigation claimed that Attorney Fussell "advised [the target] and his

17

mother to close a home that was for [the target's] personal use in the name of [the target's] mother" and that the target's mother lied on the HUD-1 Settlement Statement about who supplied the down payment. J.A. 1425.

The government sought permission to disclose this information to Wolf even though the government asserted that it was "*not* subject to *Brady-Giglio* because it was *not* known to the prosecution at the time of . . . Fussell's testimony." J.A. 1425. The district court issued a protective order granting the government's ex parte motion, and the government promptly disclosed the information to Wolf.

## C.

Following the government's disclosure of this new information pursuant to the protective order, Wolf filed a "motion for government to provide *Brady* and *Giglio* material to defense—*under seal*." J.A. 1430. Specifically, Wolf noted that the government disclosed in its ex parte motion that Fussell "'was the closing attorney for most of the approximate[ly] 100 short sales under investigation.'" J.A. 1432. Complaining that "the government's motion sought to disclose only one such short sale file," *id.*, Wolf argued that "there is good reason to believe that the other approximately 99 short sale fraud files may also contain material inconsistent with Fussell's testimony" and "request[ed] that these files be made available to [Wolf] pursuant to *Brady* and *Giglio*," J.A. 1433.

The district court denied Wolf's motion. The district court concluded that the information sought by Wolf could not be "fairly characterized as *Brady* material" and that it was "not material for the purposes of [Wolf's] quest for a new trial." J.A. 1616.

The district court described Wolf's motion for disclosure of the short sale fraud materials as "yet another attempt to engage in a wide-ranging fishing expedition post-trial, which [the court could not] permit." J.A. 1617.

*D.*

Based upon the documents the government disclosed under the protective order, Wolf filed a second motion for a new trial on the grounds that "important portions of attorney Fussell's testimony now clearly appear to be false." J.A. 1526. Wolf noted that his "defense was that Fussell had signed off on various transactions and provided legal advice as to their legality" and "[t]he new evidence contradicts Fussell's trial rebuttal testimony that he would not participate in such [fraudulent] transaction[s]." J.A. 1527. Wolf also alleged that "before, during and after [his] trial," Fussell had a large contract with HUD "to act as its closing agent for the Eastern Region of North Carolina," J.A. 1592, but that these facts were never disclosed.

The district court concluded that Wolf failed to demonstrate that he was entitled to a new trial. First, the district court concluded that the information Wolf relied upon was "merely cumulative and impeaching." J.A. 1613. The court found that "[n]othing about the [documents disclosed by the government] meaningfully contradicts" Fussell's rebuttal testimony that he did not draft Wolf's compensation agreements or advise Wolf that his scheme was legal. *Id.* Indeed, the newly disclosed "documents reference wholly separate transactions involving different actors suspected of engaging in 'short sale' fraud, which is different from the method of fraud employed . . . in this case." J.A. 1613-14. Second, the court found that the new information was "not material for the purposes of a motion

19

for [a] new trial." J.A. 1614. The district court reasoned that, "[h]ad [Wolf] had this new evidence at trial, it would, at most, have allowed him to impeach Fussell by asking him if he had ever given anyone else legal advice that resulted in a different kind of fraudulent transaction." J.A. 1615. Finally, the court stated that the new evidence "would not probably produce an acquittal." *Id.* The court noted that the evidence against Wolf was overwhelming, and the new evidence would not have changed the jury's rejection of Wolf's advice-of-counsel defense—which was based not only on Fussell but also Gates, who "testified that she did not provide [Wolf] legal advice, despite his testimony and assertions to the contrary." J.A. 1614.

## E.

Finally, Wolf filed a third motion for a new trial, arguing that the government "failed to comply with its obligations under *Giglio* to disclose impeachment evidence regarding witness Dale Fussell." J.A. 1321. Specifically, Wolf asserted that he was entitled to a new trial based upon undisclosed evidence that Fussell had a lucrative contract to perform legal work for HUD—that he "was a highly paid federal government contractor at the time of his trial testimony as a government witness against Wolf." J.A. 1324.

The district court denied Wolf's third new-trial motion as well. The court found that "this information is, at best, merely impeaching, that it is not material because its cumulative effect would not have changed the result of the proceedings, and that its introduction would not probably produce an acquittal." J.A. 1617-18.

II.

Wolf first challenges the denial of his multiple motions for a new trial based on newly discovered evidence relating to the Government's rebuttal witness. This court reviews "the district court's denial of a motion for a new trial under an abuse of discretion standard" of review. *United States v. Wilson*, 624 F.3d 640, 660 (4th Cir. 2010); *United States v. Bartko*, 728 F.3d 327, 338 (4th Cir. 2013) ("It is an abuse of discretion for the district court to commit a legal error—such as improperly determining whether there was a *Brady* violation—and that underlying legal determination is reviewed de novo." (internal quotation marks omitted)). With regard to the district court's *Brady* ruling, we apply de novo review to its legal determinations and clear error review to its factual findings. *See United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015).[3]

In order to succeed on a motion for a new trial on the basis of newly discovered evidence, the proponent must establish each of the following:

(a) The evidence must be, in fact, newly discovered, i.e., discovered since the trial;

---

[3] We reject Wolf's contention that a de novo standard of review applies to the denial of each of his new-trial motions because, according to Wolf, each new trial motion was based upon asserted *Brady* violations. Wolf's first two new-trial motions did not implicate *Brady*, and therefore abuse of discretion is the appropriate standard of review for those. To the extent Wolf's third new-trial motion is founded upon an alleged *Brady* violation, we review for abuse of discretion. *See United States v. Bartko*, 728 F.3d 327, 338 (4th Cir. 2013). However, "[i]t is an abuse of discretion for the district court to commit a legal error-such as improperly determining whether there was a *Brady* violation." *Id.* (internal quotations omitted).

(b) facts must be alleged from which the court may infer diligence on the part of the movant;

(c) the evidence relied upon must not be merely cumulative or impeaching;

(d) it must be material to the issues involved; and

(e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Singh*, 54 F.3d 1182, 1190 (4th Cir. 1995) (quotations and alterations omitted). To succeed on a *Brady* violation, the proponent must "show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, i.e., prejudice must have ensued; and (3) that the prosecution had materials and failed to disclose them." *Wilson*, 624 F.3d at 661 (internal quotation marks omitted). As set forth below, we conclude that the district court did not abuse its discretion in denying Wolf's three motions for a new trial.

## A.

First, we consider whether the district court abused its discretion in denying Wolf's initial motion for a new trial based on "newly discovered" evidence. We conclude that it did not.

After trial, Wolf's counsel "came into possession" of a compensation agreement, signed by Fussell as the closing attorney, that was used by Wolf in a separate transaction that was not part of the evidence at trial. J.A. 1186. Like the compensation agreements Wittig testified were given to him by Wolf, this one contained the terms "strike price" and "gross price." J.A. 1186. Thus, Wolf argued that Fussell, the government's rebuttal witness, had been dishonest on the stand.

22

The district court held an evidentiary hearing on this issue. Fussell testified during the hearing and admitted that his signature appeared on several similar compensation agreements. Fussell agreed that the compensation agreements contained the terms "gross price" and "strike price," but he reaffirmed that he had no idea what those terms meant. Indeed, the terms of the typical compensation agreement used by Wolf and Wittig indicated the money was going to a company for services rendered rather than to an individual. Fussell also testified that he did not advise Wolf to use compensation agreements, and that he "would not ever draft a document to kickback money to a buyer from a closing not disclosed to a lender" as he was "absolutely certain that is mortgage fraud." J.A. 1266.

The district court denied Wolf's first motion for new trial, concluding that "the evidence at the trial, absent the testimony of Mr. Fussell, was more than adequate to have the jury return the verdict that they did." J.A. 1275. Furthermore, the district court found that the compensation agreement signed by Fussell did not constitute "newly discovered evidence."

The district court is correct. Wolf's own memorandum to the district court makes clear that he was in possession of the compensation agreement *prior* to trial, as it was in a box given to him by a former assistant the week before trial. Thus, this evidence was not "newly discovered," and Wolf could not show that he exercised diligence in uncovering the documents, supporting the denial of the new-trial motion. Moreover, as Wolf's argument effectively concedes, the evidence was, at best, impeaching. At most, the "newly acquired" compensation agreement signed by Fussell established that the terms

23

"strike price" and "gross price," which Fussell testified at trial were unfamiliar to him, appeared on documents that he had signed several years earlier. Moreover, Wolf failed to demonstrate that the evidence was material and would probably produce an acquittal. The evidence of Wolf's guilt was overwhelming. Through the testimony of numerous witnesses, including co-conspirators, and hundreds of documents, the government proved not only that Wolf engaged in numerous fraudulent mortgage transactions, but also that he did so knowingly. Wolf's advice-of-counsel defense was not only refuted by Fussell, but it was also refuted by Gates and by the testimony of Wolf's co-conspirators that Wolf knowingly structured the transactions and the paper trail to deceive the lenders. The district court reasonably concluded that the evidence that Fussell signed certain of the compensation agreements years before his testimony was not material and would not likely have produced an acquittal.

B.

Next, Wolf challenges the district court's denial of Wolf's second new trial motion. We conclude that the district court was well within its discretion in denying the motion.

This motion stemmed from the government's post-trial disclosure of material from the separate investigation months after the trial. Included in the material disclosed by the government was evidence showing that Fussell had served as the closing attorney on a number of short sale transactions under grand jury investigation. Wolf thus filed a second motion for a new trial on the grounds that "important portions of attorney Fussell's testimony now clearly appear to be false." J.A. 1526. In Wolf's view, "[t]he

24

new evidence contradicts Fussell's trial rebuttal testimony that he would not participate in such [fraudulent] transaction[s]." J.A. 1527.

The district court denied the motion for a new trial. First, the court concluded that the new information was "merely cumulative and impeaching," and that nothing in the new evidence "meaningfully contradict[ed] t[he] testimony" Fussell gave at trial because the new information "reference[d] wholly separate transactions . . . involving 'short sale' fraud, which is different from the method of fraud employed" by Wolf and his co-conspirators. J.A. 1613-14. Second, the district court found that the new evidence was "not material," J.A. 1614, finding no reasonable probability that the outcome would have been different with this information. Even if Wolf had had this new evidence at trial, "it would, at most, have allowed him to impeach Fussell by asking him if he had ever given anyone else legal advice that resulted in a different kind of fraudulent transaction." J.A. 1615. The district court found the evidence immaterial because Wolf's testimony would not have established an advice-of-counsel defense, even if not contradicted by Fussell's testimony. As the district court explained, Wolf "did not testify that he told Fussell all the pertinent facts," J.A. 1614, and on that basis alone, his advice-of-counsel defense would fail. Additionally, he asserted that he received similar advice from Gates and other attorneys, but Gates "testified unequivocally that no such advice was given." J.A. 1614-15.

Finally, the district court correctly concluded that this new evidence would not have probably produced an acquittal. This element of the newly-discovered-evidence test requires the district court "to make a credibility determination . . . focus[ing] on whether

25

a jury probably would reach a different result upon hearing the new evidence." *United States v. Lighty*, 616 F.3d 321, 374-75 (4th Cir. 2010) (internal quotation marks omitted). The district court made that credibility determination and concluded that Wolf's guilt was supported by the testimony of numerous witnesses who described "in great detail" the activities of the co-conspirators and Wolf's role in the conspiracy. J.A. 1615. The district court noted that this testimony was supported by hundreds of documents, many of which directly implicated Wolf. In light of the strength of the government's evidence of Wolf's guilt and the relatively minor contribution Fussell's testimony made to the totality of the government's case, the district court reasonably concluded that the short-sale evidence did not create a reasonable probability of a different result. Particularly in light of the overwhelming evidence that Wolf knew he was facilitating fraudulent transactions, the district court reasonably concluded that "the cumulative effect of this additional evidence would not create a reasonable probability that the outcome of the trial would have been different." J.A. 1615.

The district court was clearly within its discretion to deny the second motion for a new trial. We affirm this decision.

C.

Wolf argues that the district court committed reversible error by denying his third motion for a new trial based on information Wolf discovered while his second new trial motion was pending. More than a year after his own trial, Wolf discovered that Fussell testified during a civil trial in the United States Court of Federal Claims that he had had a lucrative contract to perform legal work for HUD since 2011. Wolf asserts that Fussell

26

was therefore "a highly paid federal government contractor at the time of his trial testimony as a government witness against Wolf." J.A. 1324.

The government never disclosed this impeachment evidence, and Wolf was unable to impeach Fussell with it during Fussell's rebuttal testimony. Wolf did not assert that the prosecutors were aware that Fussell did contract legal work for HUD. Nonetheless, Wolf contended that the government had knowledge of this information and had a duty to disclose it under *Giglio v. United States*, 405 U.S. 150 (1972), and *Brady v. Maryland*, 373 U.S. 83 (1963). Wolf sought a new trial based on the government's alleged violation of its duty of disclosure, arguing that there was a reasonable probability that the result of the trial would have been different had Wolf been able to use the information to impeach Fussell.

The district court denied Wolf's third new-trial motion as well. The court noted "that this information is, at best, merely impeaching, that it is not material because its cumulative effect would not have changed the result of the proceedings, and that its introduction would not probably produce an acquittal." J.A. 1617-18.

We see no error on the part of the district court. To receive a new trial based on the government's violation of *Giglio* or *Brady*, the defendant must "show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, *i.e.*, prejudice must have ensued; and (3) that the prosecution had [the] materials and failed to disclose them." *United States v. Wilson*, 624 F.3d 640, 661 (4th Cir. 2010) (internal quotation marks omitted). Wolf does not suggest the prosecutors in his case had these materials until well after trial. Wolf also

27

cannot demonstrate prejudice, in light of the overwhelming evidence of guilt that we have detailed above. We find no abuse of discretion in the district court's denial of Wolf's third motion for a new trial.

D.

Finally, Wolf challenges the district court's denial of his motion to compel the government to produce approximately 99 "short sale" files discovered during a separate and unrelated grand jury investigation in which Fussell was the closing attorney. Wolf argued that "there is good reason to believe that the other approximately 99 short sale fraud files may also contain material inconsistent with Fussell's testimony" and "request[ed] that these files be made available to [Wolf] pursuant to *Brady* and *Giglio*," J.A. 1433.

The district court denied Wolf's motion, stating that the information sought by Wolf could not be "fairly characterized as *Brady* material" and that it was "not material for the purposes of [Wolf's] quest for a new trial." J.A. 1616. The district court described Wolf's motion for disclosure of the short sale fraud materials as "yet another attempt to engage in a wide-ranging fishing expedition post-trial, which [the court could not] permit." J.A. 1617.

Once again, we agree with the district court. To prevail on a *Brady* claim, a defendant must show that "(1) the evidence is favorable to the accused because it is exculpatory or impeaching; (2) the evidence was suppressed by the government, either willfully or inadvertently; and (3) the evidence is material." *United States v. McLean*, 715 F.3d 129, 142 (4th Cir. 2013). "To be material, there must be a reasonable

28

probability that disclosure of the evidence would have produced a different outcome."
*Id.*

The government did not have this evidence until after Wolf's trial ended. Therefore there was no *Brady* violation. Furthermore, any argument that the evidence would have produced a different outcome was based on sheer speculation. As the district court pointed out, Wolf was trying to use *Brady* to engage in a post-trial fishing expedition for material evidence. "*Brady* requests cannot be used as discovery devices." *United States v. Caro*, 597 F.3d 608, 619 (4th Cir. 2010). "There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one." *Id.* (internal quotation marks omitted)).

III.

Next, Wolf argues that the district court erroneously denied his motion in limine to exclude testimony from Dr. Sherrill, the government's expert witness on mortgage banking practices. This court reviews a district court's decision on the admissibility of evidence for abuse of discretion. *See Minter v. Wells Fargo Bank, N.A.*, 762 F.3d 339, 349 (4th Cir. 2014).

Dr. Sherrill testified to the jury as an expert witness. She was allowed by the court to testify as to whether certain categories of information would have been material to lenders. For example, over objection, Sherrill was allowed to testify to the materiality of representations about down payments (because the buyers in Wolf's scheme did not ever put money down):

Q. Does it matter typically to a lender whether or not the buyer is really putting the down payment down?

A. Absolutely.

J.A. 155-56. Wolf argues Dr. Sherrill was not qualified, due to lack of personal knowledge and adequate expertise, to testify about the materiality of the alleged misrepresentations—apparently because she had never worked with the specific lenders involved here. This is a losing argument, because the test for whether a false statement to a bank is material is an objective one; it does not change from bank to bank. *See United States v. Irvin*, 682 F.3d 1254, 1267 (10th Cir. 2012) (explaining that "materiality in the bank fraud context [is] an *objective* quality, unconcerned with the subjective effect that a defendant's representations actually had upon the bank's decision").

Wolf's primary attack seems to be that Dr. Sherrill's testimony as to materiality constituted an improper legal conclusion. Rule 702(a) of the Federal Rules of Evidence provides that "if . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," then "[a] witness . . . qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion." Wolf argues that under Rule 702, "[e]xpert testimony that merely states a legal conclusion is less likely to assist the jury in its determination." *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002).

Sherrill was not offering legal conclusions. She was testifying, based on her extensive experience, about the mortgage process, about which most lay people know very little. Expert testimony intended to help the jury understand the relevant industry is

admissible.  As the Eighth Circuit explained, "[m]ortgage underwriting standards are beyond the experience of the typical juror," and thus expert testimony is admissible to "help[] the jury to understand documents with which they may not have been familiar, and [to give] them a basis for determining whether [the defendant's] alleged misrepresentations were material." *United States v. Spencer*, 700 F.3d 317, 321 (8th Cir. 2012).  The district court was well within its considerable discretion in admitting Sherrill's expert testimony.

IV.

Wolf next challenges the sufficiency of the evidence to support a finding of materiality.  Wolf was convicted on three counts in the indictment.  Count 1 charged Wolf with RICO conspiracy to commit the predicate acts of bank fraud, wire fraud, and money laundering in violation of 18 U.S.C. § 1962(d); Count 3 charged bank fraud in violation of 18 U.S.C. § 1344; and Count 5 charged conspiracy to launder money in violation of 18 U.S.C. § 1956(h).  Following trial, Wolf renewed his motion for acquittal, arguing that the government was required to prove materiality with respect to each count but failed to do so.

We apply a de novo standard of review when considering a challenge to the district court's denial of a motion for acquittal based on sufficiency of the evidence. *United States v. Reed*, 780 F.3d 260, 269 (4th Cir. 2015).  Any defendant who contends that there was insufficient evidence to sustain a guilty verdict against him "must overcome a heavy burden." *United States v. Hoyte*, 51 F.3d 1239, 1245 (4th Cir. 1995). The court "must uphold the jury's verdict if, viewing the evidence in the light most

31

favorable to the government, substantial evidence supports it." *United States v. Kiza*, 855 F.3d 596, 601 (4th Cir. 2017). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *United States v. Cornell*, 780 F.3d 616, 630 (4th Cir. 2015) (internal quotation marks omitted). "Reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *United States v. Ashley*, 606 F.3d 135, 138 (4th Cir. 2010) (internal quotation marks omitted).

A.

The district court gave a materiality instruction with respect to both Count 1 (the RICO conspiracy charge) and Count 3 (the bank fraud charge). Regarding Count 1, the district court instructed that for Wolf to be guilty of the RICO conspiracy offense, the government must prove beyond a reasonable doubt that he joined "a conspiracy" that "existed to participate in . . . an enterprise that affected interstate . . . commerce through a pattern of racketeering activity." J.A. 1112-13. In turn, the court instructed the jury that "[a] pattern of racketeering activity requires as least two acts of racketeering activity," which here "include[d] bank fraud, wire fraud, or money laundering." J.A. 1115.

The district court then instructed the jury on the predicate act of wire fraud under 18 U.S.C. § 1343, explaining that materiality was an element of wire fraud: "A violation of this statute . . . require[s] proof that the defendants . . . devised . . . a scheme to defraud or for obtaining money or property by means of false or fraudulent . . . representations . . . *that were material*." J.A. 1117 (emphasis added). The court likewise instructed the jury that to find Wolf guilty of bank fraud—which was charged in the

32

indictment both as a predicate act of racketeering and as a separate substantive offense—the government would have to prove that he "knowingly executed or attempted to execute a plan . . . to obtain [money] . . . under the custody or control of [a] bank"; that he executed the plan by means of "false pretenses, representations or promises"; and "that the fraudulent pretenses, representations or promises *were material*." J.A. 1126-27 (emphasis added).

With respect to money laundering under 18 U.S.C. § 1956(h)—which was also charged as a predicate act of racketeering and as a separate substantive offense—the district court instructed that the government was required to prove that Wolf "conducted or attempted to conduct a financial transaction; . . . [which] involved the proceeds of specified *unlawful activity*; . . . [knowing] that the property involved . . . the proceeds of some form of unlawful activity;" J.A. 1135, in order to "conceal or disguise the nature . . . of the unlawful activity," *id.*, or "to promote the carrying on of the . . . unlawful activity," J.A. 1136. Finally, the jury was told that "[w]ire and bank fraud are specified unlawful activities." J.A. 1137.[4]

Finally, the district court defined the meaning of a "material" statement or representation as follows:

> A statement or representation is material if it has a natural tendency to influence or is capable of influencing a decision or action of the decision-

---

[4] Therefore, Wolf's motion for acquittal based on insufficient evidence of materiality also encompassed the separate money laundering count because the money laundering count "was premised on either Count One or Count Three being the specified unlawful activity." Appellant's Reply Brief at 11.

33

maker. . . . [T]he government need not prove that any particular lender subjectively relied upon the alleged statement or representation, but must prove beyond a reasonable doubt that such statements or representations *would have been important to a reasonable lender.*

J.A. 1120 (emphasis added).[5]

## B.

There was plenty of evidence from which a reasonable juror could conclude beyond a reasonable doubt that Wolf's "statements or representations would have been important to a reasonable lender." J.A. 1120. Ample evidence was presented that, in every transaction he conducted, Wolf lied on documents that lenders considered extremely important, such as HUD-1 settlement statements, sales contracts, and appraisals.

Gates, an attorney who closed real estate transactions for Wolf and who was charged as one of Wolf's co-conspirators, testified that she was aware of the compensation agreements used in his transactions. According to Gates, the fraudulent, inflated "gross" price was used in the sales contract and the HUD-1 settlement statement and that "[e]verything was based off of that price." J.A. 733. Gates, a sole practitioner focusing on real estate transactions, stated that she never provided the actual or "strike" price of any property to any bank "because [she] knew that the bank wouldn't do the closing. It wouldn't do the loan." J.A. 734.

---

[5] The government takes the position that materiality does not have to be proven to establish that Wolf engaged in a RICO conspiracy to commit wire fraud, bank fraud, and money laundering. Our conclusion would be the same, however, regardless of whether materiality is an element of the RICO conspiracy charged in Count 1.

Clarke, a co-conspirator who purchased homes in Wolf's scheme, worked in the mortgage industry as a loan officer from 1998 to 2005. Clarke testified that he did not disclose to the lender that he was receiving a sum of money through the transaction, explaining that "[t]he bank would not approve a loan where money [was] going to a company that I own[ed] if [I was] the buyer." J.A. 428-29. Likewise, Vaughn testified that she was serving as "a loan officer working for two mortgage companies," J.A. 638, during her dealings with Wolf. According to Vaughn, Wolf sent her compensation agreements and other documents related to the real estate transactions Wolf had brokered, but indicated that he did not want Vaughn to pass them along to the lending institution. And Long, who participated as the buyer in two deals with Wolf, understood that if the lending institution had been aware that he was receiving enormous kickbacks at closing, it would not have agreed to make the loan.

Finally, Dr. Sherrill, the government's expert witness, testified that the kinds of misrepresentations Wolf made during all of these transactions would have mattered greatly to any mortgage lender. According to Dr. Sherrill, "the lender will make a determination [on] how much to loan," J.A. 153, based on the sales price. Dr. Sherrill explained that whether the buyer makes a down payment and, if so, how much the buyer puts down are questions that a lender considers of vital importance—"[i]t represents the risk involved in the transaction. . . . [T]he more the down payment . . . , the less the risk." J.A. 156. Dr. Sherrill also explained that if it were disclosed that "a large amount of money [was] being paid from the seller to the buyer," the appraiser "would have to lower the amount of the appraisal"—obviously an important consideration for a lender. J.A.

35

161. Dr. Sherrill stated that the information set forth on the HUD-1 settlement statement is exceptionally important to a bank. The HUD-1 settlement statement, which federal law requires for every residential real estate transaction, requires the disclosure of "deposit or earnest money" as well as "cash at settlement from or to [the] borrower." J.A. 168. And, no fee can appear on the HUD-1 form "that [has not been] earned." J.A. 171.

Any reasonable juror could conclude beyond a reasonable doubt, based on the evidence in the record, that false representations made in the documents connected to the real estate transactions at issue would have been of critical importance to the lenders. We conclude that the record contains more than adequate evidence of materiality to sustain Wolf's convictions.

V.

Finally, Wolf challenges various aspects of his sentence. We review a district court's findings of fact related to the application of the Sentencing Guidelines for clear error, whether the findings involve the amount of loss, *see United States v. Keita*, 742 F.3d 184, 191 (4th Cir. 2014); the number of victims, *see Bartko*, 728 F.3d at 346; an aggravated role in the offense, *see United States v. Llamas*, 599 F.3d 381, 389 (4th Cir. 2010); or use of sophisticated means. Application of the abuse-of-a-position-of-trust enhancement is reviewed de novo, although the underlying factual findings are reviewed for clear error. *See United States v. Brack*, 651 F.3d 388, 392 (4th Cir. 2011).

A.

Wolf asserts that the district court committed error in finding that a loss of $7.1 million was reasonably foreseeable to Wolf under U.S.S.G. § 2B1.1. Section 2B1.1(b)(1) provides for an enhancement based upon the "greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm the resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i). The loss amount "must be supported by a preponderance of the evidence" but "need not be determined with precision." *Keita*, 742 F.3d at 192 (internal quotation marks omitted). "The determination of loss attributable to a fraud scheme is a factual issue for resolution by the district court, . . . [and] [t]he court need only make a reasonable estimate of the loss, given the available information." *Id.* at 191-92 (internal quotation marks omitted).

The district court calculated the loss by taking the total loan amount for each property involved, which was based on Wolf's inflated prices, and then subtracting the amount recovered by the lender after the foreclosure sale. This was a reasonable method of determining actual loss. *See United States v. Farano*, 749 F.3d 658, 664-65 (7th Cir. 2014) (loss in elaborate real estate financing fraud scheme was the amount of the original loan minus the proceeds from the foreclosure sale). The district court used this method to calculate the actual loss for each of the properties. For example, in calculating the loss associated with the 2900 Crane Road property for which Long served as the buyer, the actual loss was the total original loan amount, $1,335,702.79, less the $400,000 recovered from the foreclosure sale, which resulted in a net actual loss of $935,702.79 for 2900 Crane Road. Using this method to determine the actual loss for each property, the court added up the loss amount for all the properties and arrived at a final sum of more than

37

$7.1 million.  The district court thus applied the prescribed 20-level enhancement for a loss between $7 and $20 million.  *See* U.S.S.G. § 2B1.1(b)(1)(K).

Wolf argues that, based on the evidence provided at sentencing, the court's method was faulty.  Specifically, Wolf points to the government's spreadsheet that breaks down, for each property involved, the original loan amount, the intended loss, and the resale amount following foreclosure.  Wolf believes that the spreadsheet reflects that for most of the properties, the lender "appears" to have sold its devalued loan on the secondary market prior to foreclosure.  Wolf contends that since there is no evidence regarding how much these loans were sold for, it is impossible to know how much harm the lender suffered.  Wolf suggests the district court should have used the "intended" loss—that is, the amount Wolf and his friends intended to take from the bank by fraud.  If this measure were used, the total loss would be $3.3 million.

In response, the government suggests that Wolf misapprehends the foreclosure process.  "When a property forecloses, the bank first purchases the property in a foreclosure sale, almost always as a trustee, *i.e.*, it purchases its own loan so that it can subsequently sell the property in foreclosure to a third party.  It is that subsequent sale, to someone other than the bank that held the note, that is the true foreclosure sale, and it is that sale that the district court properly used in calculating the loss reasonably foreseeable to [Wolf]."  Brief of Appellee at 58.

Based on the record, it is difficult to determine precisely what happened to each loan.  We need not make that determination to affirm the district court's calculation of loss, however.  The only task for the sentencing court is to make a reasonable estimate of

38

"the reasonably foreseeable pecuniary harm the resulted from the offense." U.S.S.G. §

2B1.1 cmt. n.3(A)(i). "Reasonably foreseeable pecuniary harm" is "pecuniary harm that

the defendant knew or, under the circumstances, reasonably should have known, was a

potential result of the offense." U.S.S.G. § 2B1.1, cmt. 3(A)(iv). Clearly Wolf must

have known that houses purchased in his scheme were very likely to go into foreclosure,

in view of the fact that straw purchasers overpaid for them with fraudulently obtained

mortgage loans. Thus, the difference between the total loan amount and the amount

recovered in foreclosure proceedings is the appropriate measure of loss. Thus, we reject

Wolf's argument that actual loss cannot be determined in this case because the record

does not contain information relating to sales on the secondary mortgage market. *See*

*Farano*, 749 F.3d at 664-65 (rejecting the argument that refinancing breaks the causal

link between the original fraud; the difference between the original loan amount and the

proceeds from the foreclosure sale was the reasonably foreseeable pecuniary harm that

resulted from the offense).

Accordingly, we conclude that the district court's determination of loss was not

clearly erroneous based on the information available to it, and the court's finding was

supported by a preponderance of the evidence. We conclude that the district court did not

commit reversible error in its application of an enhancement for a loss amount of $7.1

million.

B.

Next, Wolf argues that the district court erroneously applied a three-level

enhancement based on its finding that Wolf was a manager or supervisor of criminal

39

activity. Under U.S.S.G. § 3B1.1(b), the sentencing court applies a three-level enhancement "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." Because "the Guidelines do not define the term manager," this court has consulted the dictionary definition of "manager" to derive its meaning under U.S.S.G. § 3B1.1(b): "[A] person whose work or profession is the management of a specified thing (as a business, an institution, or a particular phase or activity within a business or institution)." *United States v. Slade*, 631 F.3d 185, 190 (4th Cir. 2011) (internal quotation marks omitted). For this three-level enhancement to apply, there must be "record evidence that the defendant actively exercised some authority over other participants in the operation or actively managed its activities." *Id. at* 190; *United States v. Bartley*, 230 F.3d 667, 673 (4th Cir. 2000) ("The record supports the district court's finding that Bartley was a manager or supervisor in each of the conspiracies. The government presented evidence that Bartley controlled the activities of other participants in the drug distribution conspiracy . . . .").

It is clear from the evidence that Wolf played at least a manager's role in the scheme, drawing up compensation agreements and deciding on a property's gross price, selecting floor plans, determining what information to include on the HUD-1 settlement statements, recruiting new participants in the conspiracy, and controlling which documents would and would not be submitted to the lender. We find no error in the district court's application of a three-level enhancement for a manager's or supervisor's role.

40

Wolf focuses on application note four, which sets forth a non-exclusive, seven-factor list for sentencing courts to consider *in distinguishing a leadership and organizational role from one of mere management* or supervision." U.S.S.G. § 3B1.1 cmt. n.4 (emphasis added).

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the *claimed right to a larger share of the fruits of the crime*, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4 (emphasis added); *see United States v. Otuya*, 720 F.3d 183, 192-93 (4th Cir. 2013).

Wolf contends that he received a relatively small portion of the proceeds and therefore should not be considered a manager or supervisor, focusing on the guideline commentary that states that a manager or supervisor is likely to "claim[] [the] right to a larger share of the fruits of the crime." U.S.S.G. § 3B1.1 cmt. n. 4. By its very terms, however, application note four does not provide guidance for determining whether to apply—in the first place—an aggravating role enhancement. Rather, it is for "distinguishing a leadership and organizational role from one of mere management or supervision." *Id.* Accordingly, we reject Wolf's challenge to the manager or supervisor enhancement, which the district court properly applied.

## C.

Wolf likewise argues that the court did not have a sufficient basis for applying a sophisticated-means enhancement. Section 2B1.1(b)(10)(C) directs the sentencing court

to increase the offense level by two levels if "the offense otherwise involved sophisticated means." The commentary to the Guideline provides examples warranting application of the sophisticated-means enhancement, including "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts." U.S.S.G. § 2B1.1 cmt. n.9(B). As we previously observed, "[t]he enhancement requires some means of execution that separates the offense before us from the ordinary or generic." *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012) (examining identical "sophisticated means" enhancement under the tax fraud guideline). A defendant, however, "need not utilize the most complex means possible to conceal his fraudulent activities in order for the court to find that he used sophisticated means. . . . The court need only find the presence of efforts at concealment that go beyond (not necessarily far beyond) the concealment inherent in [the] fraud." *Id.* (internal quotation marks and alteration omitted).

Here, there was sufficient evidence for the district court to conclude that Wolf used a means of concealment that went beyond the concealment inherent in bank fraud. Wolf disguised the kickbacks to the straw buyers as payments to companies for work done on the property. In actuality, Wolf asked the buyers to identify a company name to use on the HUD-1 as the company receiving payment for services rendered, even though no work was ever performed. Wolf even ensured that fraudulent invoices purporting to reflect the nonexistent work were provided to the bank through the closing attorney. This conduct fits well within the guideline parameters for a sophisticated means enhancement. *See, e.g., United States v. Huston*, 744 F.3d 589, 592 (8th Cir. 2014) (concluding that

42

sophisticated-means enhancement was appropriate where "the conspirators recruited straw buyers, obtained inflated appraisals, and created two entities to submit fraudulent billings and disburse loan proceeds to themselves and kickbacks to the buyers without arousing lender suspicion"). We conclude the district court did not clearly err in imposing a two-level sophisticated-means enhancement.

D.

Finally, Wolf argues that there was an insufficient basis for applying a two-level enhancement for abuse of a position of trust. Under U.S.S.G. § 3B1.3, "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense," then the sentencing court must increase defendant's offense level by two levels. "'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion." U.S.S.G. § 3B1.3, cmt. n.1. "[T]he central purpose of § 3B1.3 is to penalize defendants who take advantage of a position that provides them with the freedom to commit a difficult-to-detect wrong." *Brack*, 651 F.3d at 393–94 (internal quotation marks and alterations omitted). "The abuse-of-trust enhancement accordingly applies when a victim's trust is based on the defendant's unique position, but not when trust is created in an arms-length commercial relationship. . . . Before imposing a § 3B1.3 enhancement, courts consequently look for evidence indicating a fiduciary or personal trust relationship exists between the victim and the defendant." *Id.* (internal quotations marks omitted).

43

However, "[f]or this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult)." U.S.S.G. § 3B1.3, cmt. n.1. A "position of public or private trust must . . . contribute in some significant way to facilitating the commission or concealment of the defendant's underlying crime." *Brack*, 651 F.3d at 393 (internal quotation marks and alteration omitted).

We have no difficulty concluding that Wolf's position as a licensed real estate broker contributed to the execution and cover-up of the bank fraud scheme. The more troublesome question is whether Wolf occupied a position of public or private trust. A real estate broker certainly has special or fiduciary obligations to the buyer, the seller, or both. *See United States v. Akinkoye*, 185 F.3d 192, 203-04 (4th Cir. 1999). Because we assess whether Wolf held a position of trust under § 3B1.3 from "the perspective of the victim," *id.*, the question is whether Wolf, as a real estate broker, held "[s]omething . . . akin to a fiduciary function," *United States v. Agyekum*, 846 F.3d 744, 756 (4th Cir. 2017) (internal quotation marks omitted), with respect to the lenders.

In North Carolina, a real estate agent's duties extend beyond the principals they represent "to other parties (i.e., 'third persons') with whom the agent deals in any real estate transaction." J.A. 1690. According to the North Carolina Real Estate Manual in effect in 2003, a real estate agent's duties to third persons include:

- [The] [d]uty to refrain from misrepresenting or failing to disclose a material fact as prohibited by the North Carolina Real Estate License Law

44

- [The] [g]eneral duty of "honesty and fairness" under the common law

- [The] [d]uty to refrain from unfair or deceptive trade practices which are prohibited by consumer legislation

J.A. 1691. The Manual also touches on loan fraud, noting that North Carolina law prohibits real estate agents from making misrepresentations "to anyone involved in a real estate transaction, *including a lender*." J.A. 1696-97 (emphasis added). *See* N.C. Gen. Stat. § 93A-6(a)(1)&(10).

In light of these obligations, we conclude that Wolf's duties and responsibilities towards a lender in connection with a real estate transaction are akin to fiduciary duties. He used his knowledge and position as a real estate broker to assist the commission of bank fraud, as well as its concealment. Real estate agents owe a special duty of honesty and fair dealing to third parties, such that the lender and the agent have a trust relationship with respect to real estate transactions. Wolf abused his position of trust by engaging in the fraudulent conduct previously described in detail. Thus, we conclude that the district court properly applied the two-level enhancement for abuse of a position of trust.[6]

---

[6] Wolf also raised a challenge to the district court's application of a two-level enhancement for Wolf's offense having more than ten victims. *See* U.S.S.G. § 2B1.1(b)(2)(A)(i). The PSR identified 11 lender victims based on the evidence at trial. It also indicated that pursuant to Mandatory Victim Restitution Act, all of the victims were "afforded the opportunity to identify any restitution due" and provide any other "loss information," but the probation office received "no response" from any of the lenders. J.A. 1494. Wolf argues that because none of the victims responded to the inquiries of the probation office, then it cannot be established that there were ten or more victims. The guidelines do not require a victim's response before this enhancement may be applied, (Continued)

VI.

For the foregoing reasons, Wolf's convictions and sentence are hereby affirmed.

AFFIRMED

---

and Wolf cites no authority to support this proposition.  We reject this sentencing challenge as well.