**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 16-4247**

─────────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MOHSIN RAZA,

Defendant – Appellant.

─────────────

**No. 16-4259**

─────────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

FARUKH IQBAL,

Defendant – Appellant.

─────────────

**No. 16-4261**

─────────────

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MOHAMMAD ALI HAIDER,

Defendant – Appellant.

_____

**No. 16-4262**

_____

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

HUMAIRA IQBAL,

Defendant – Appellant.

_____

Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, Senior District Judge. (1:15-cr-00118-CMH-1, 1:15-cr-00118-CMH-3, 1:15-cr-00118-CMH-4, 1:15-cr-00118-CMH-2)

_____

Argued:  September 15, 2017                    Decided:  November 20, 2017

_____

Before NIEMEYER, KING, and HARRIS, Circuit Judges.

_____

Affirmed by published opinion.  Judge King wrote the opinion, in which Judge Niemeyer and Judge Harris joined.

_____

**ARGUED**: Geoffrey Paul Eaton, WINSTON & STRAWN LLP, Washington, D.C., for Appellants.  Jack Hanly, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.  **ON BRIEF**: G. Derek Andreson, Thomas M. Buchanan, Ilan Wurman, WINSTON & STRAWN LLP, Washington, D.C., for Appellant Mohsin Raza. John N. Nassikas III, R. Stanton Jones, Dirk C. Phillips, Robert A. DeRise, ARNOLD & PORTER LLP, Washington, D.C., for Appellant Humaira Iqbal.  Peter H. White, Gary Stein, Jeffrey F. Robertson, Brittany L. Lane, SCHULTE ROTH & ZABEL LLP, Washington, D.C., for Appellant Farukh Iqbal.  Thomas G. Connolly, Patrick O'Donnell,

2

Stephen W. Miller, Lauren E. Snyder, HARRIS, WILTSHIRE & GRANNIS LLP, Washington, D.C., for Appellant Mohammad Ali Haider.   Dana J. Boente, United States Attorney, Joseph A. Capone, Special Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

KING, Circuit Judge:

In February 2016, the defendants in these proceedings — Mohsin Raza, Humaira Iqbal, Farukh Iqbal, and Mohammad Ali Haider — were convicted by a jury in the Eastern District of Virginia of the offenses of wire fraud and conspiracy to commit wire fraud. Those crimes were predicated on a fraudulent mortgage lending scheme centered at the Annandale branch of SunTrust Mortgage in Fairfax County, Virginia.[1] The defendants have appealed, maintaining that the trial court fatally undermined their convictions by giving erroneous instructions to the jury. As explained below, we reject the contentions of error and affirm.

I.

A.

On April 23, 2015, a federal grand jury in Alexandria, Virginia, returned a seven-count indictment against the defendants — who were former employees of SunTrust's Annandale branch.[2] The indictment's first count charged them with conspiracy to

---

[1] The fraudulent mortgage lending scheme underlying this prosecution touched not only SunTrust Mortgage (the subsidiary entity), but also SunTrust Bank (the parent entity) as the fraud scheme's primary victim. Because the distinctions between those banking entities are immaterial in these appeals, we refer to them jointly as "SunTrust."

[2] The indictment against the defendants is found at J.A. 27-40. (Citations herein to "J.A. __" refer to the contents of the Joint Appendix filed by the parties in these appeals.)

4

commit wire fraud affecting a financial institution, in contravention of 18 U.S.C. § 1349.[3]

Counts 2 through 7 made substantive allegations of wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343.[4]  The substantive offenses were interposed against defendants Raza and Farukh Iqbal (Count 2); Raza and Humaira Iqbal (Counts 3 and 5); Raza alone (Counts 4 and 6); and Raza and Haider (Count 7).

The fraud scheme underlying the indictment involved a total of twenty-five mortgage loans made by SunTrust from May 2006 through February 2007.[5]  Pursuant thereto, the defendants prepared fraudulent mortgage loan applications for prospective

---

[3] The wire fraud conspiracy offense in Count 1 of the indictment was alleged as a violation of section 1349 of Title 18 of the United States Code, which provides, in pertinent part:

> Any person who conspires to commit [an] offense under this chapter [including 18 U.S.C. § 1343] shall be subject to the same penalties as those prescribed for the offense [that is, § 1343], which was the object of the . . . conspiracy.

[4] The substantive wire fraud offenses in Counts 2 through 7 of the indictment were alleged as violations of section 1343 of Title 18 of the United States Code, which provides, in pertinent part:

> Whoever, having devised . . . [a] scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate . . . commerce, any writings . . . for the purpose of executing such scheme or artifice, shall be [punished as provided by law]. If the violation . . . affects a financial institution [the permissible penalties are enhanced].

[5] The general statute of limitations for federal criminal offenses is five years. *See* 18 U.S.C. § 3282(a).  No such defense was interposed in this prosecution, in that none was available. *See id.* § 3293(2) (establishing ten-year limitations period for offense of wire fraud affecting a financial institution).

5

SunTrust borrowers. The false information contained in the loan applications underlying the indictment included, inter alia, false employment claims, inflated incomes, and overstated assets. As a result, SunTrust made twenty-five mortgage loans on thirteen properties located in various cities and counties in eastern Virginia.[6]

B.

The trial of the defendants was conducted in Alexandria in late January and early February of 2016. To understand those proceedings, a brief explanation of the

[6] The "manner and means of the conspiracy" were described in paragraphs 11-15 of Count 1 of the indictment as follows:

- The defendants prepared false mortgage loan applications for prospective borrowers at SunTrust. They well knew that the loan applications contained false material information, such as inflated incomes, inflated assets, reduced liabilities, and statements indicating that prospective borrowers intended to use the subject properties as their primary residences.

- To support false information contained in the loan applications, the defendants obtained and prepared multiple false documents, such as counterfeit earning statements for prospective borrowers and sham letters from accountants.

- Raza, as a loan officer at SunTrust, submitted false loan applications prepared by him and Humaira Iqbal to SunTrust underwriters. Farukh Iqbal and Haider, as loan officers at SunTrust, submitted additional false loan applications to those underwriters.

- By submitting false loan applications and false documents to SunTrust, the defendants caused SunTrust to make mortgage loans to the borrowers. The defendants thereby caused SunTrust to fund fraudulent mortgage loans on at least thirteen properties in eastern Virginia.

The substantive wire fraud offenses in Counts 2 through 7 realleged and incorporated the foregoing as the "scheme to defraud" underlying those six charges.

6

relationships between the defendants and their responsibilities at SunTrust is appropriate. During the relevant time frame, defendant Raza managed SunTrust's Annandale office. Raza's wife, defendant Humaira Iqbal, worked as Raza's personal assistant. Humaira's brothers, defendants Farukh Iqbal and Haider, worked for Raza as loan officers. Each of the defendants performed loan officer duties during the fraud scheme.

The SunTrust loan officers assisted prospective borrowers in obtaining residential mortgages and refinancing existing mortgages. During a consultation with such a loan officer, a prospective borrower would provide information relating to, inter alia, the borrower's income, employment, and assets. The loan officer utilized that information to prepare the prospective borrower's mortgage loan application. In preparing an application, the loan officer would select the type of loan that SunTrust should consider for approval. The different types of SunTrust loans had distinct interest rates and separate requirements with respect to supporting evidence. For example, pursuant to SunTrust guidelines, a "full document" loan required supporting documents corroborating the loan applicant's income, employment, and assets. On the other hand, a "stated income, stated asset" loan required only those documents necessary to verify the applicant's employment for the prior two years.

After completing a loan application, the loan officer forwarded it to a SunTrust underwriter in Richmond for review and possible approval. The underwriter would sometimes conditionally approve a loan application, subject to the bank's receipt of additional supporting documents. If the loan officer and the applicant thereafter fulfilled the specified conditions — for example, by providing the underwriter with the applicant's

7

pay stubs or bank statements — the loan application would be approved for closing. SunTrust would then fund the loan by wiring money from Georgia to a bank account in Virginia. Following the loan closing, SunTrust paid a commission to the loan officer.

1.

The prosecution's case-in-chief, which encompassed five trial days, consisted of four categories of evidence. First, the prosecutors called two coconspirators who explained the wire fraud conspiracy and the fraud scheme. Next, the prosecution presented testimony from the SunTrust borrowers involved in the mortgage loans underlying the wire fraud offenses. Third, other SunTrust borrowers were called to buttress the conspiracy evidence and to provide evidentiary support for the fraudulent practices underlying the wire fraud scheme. Finally, a SunTrust official explained the significance to SunTrust of the misrepresentations on the pertinent loan applications and the risks those misrepresentations posed to the bank.

a.

Rina Delgado worked as a loan officer at SunTrust's Annandale branch during Raza's tenure as the branch manager. She described a fraud scheme that was largely overseen by Raza and his wife Humaira Iqbal. As explained by Delgado, either Raza or Humaira reviewed each loan application originated at Annandale before it was submitted to the SunTrust underwriters. Raza and Humaira would check the prospective borrower's income, assets, and liabilities, seeking to ascertain whether the applicant was qualified for SunTrust mortgage loans. If an applicant's income was insufficient, Raza and Humaira would sometimes have Delgado inflate the applicant's income on the loan application.

8

Delgado described in detail how the defendants used a series of false representations and fraudulent documents to circumvent SunTrust's loan requirements. She identified an incident when Humaira Iqbal needed a landlord to verify that a loan applicant was paying rent. Humaira had Delgado impersonate the applicant's landlord over the phone and falsely confirm to a SunTrust underwriter that the applicant was current on his rental payments. In a similar vein, Farukh Iqbal and Haider asked Delgado to secure fraudulent accounting records to verify the assets shown on pending loan applications. Delgado responded by providing Farukh with false bank statements that were used to further the scheme. Delgado pleaded guilty in federal court in 2013 to an information that charged a wire fraud conspiracy offense. Pursuant to her plea agreement with the United States Attorney, she cooperated with the prosecutors. Delgado was sentenced to prison for her involvement in the fraud conspiracy.

Another key prosecution witness concerning the conspiracy offense was Ranjit Singh — a tax preparer in northern Virginia. In 2015, Singh confessed to the FBI that he had manufactured and delivered false tax and payroll documents to the defendants. Singh cooperated with the FBI and the prosecutors and was given immunity. In 2006 and 2007, Singh sold false pay stubs and false W-2 forms to Farukh Iqbal and Haider. Singh knew that those defendants were SunTrust loan officers and that the false documents would be used to help loan applicants qualify for SunTrust mortgage loans. In carrying out the fraud scheme, Farukh and Haider provided Singh with the identities of loan applicants, the names of purported employers, employment dates, and salaries. Singh used that information in his tax and payroll programs to generate false documents that he provided

9

to loan officers. Singh produced a spreadsheet at trial — introduced as Government's Exhibit 50B — that identified the false documents he had prepared in connection with the fraud scheme. *See* J.A. 2153-61. Several spreadsheet entries corresponded with false documents that supported phony loan applications prepared by the defendants and used in furtherance of the fraud scheme.

b.

In May 2006, Silvana Rosero obtained $437,000 in mortgage loans from SunTrust to purchase residential real estate in Occoquan, Virginia. A wire transfer of those loan proceeds from a SunTrust account in Atlanta to a BB&T account in Richmond formed the basis for the wire fraud charge in Count 2 against Raza and Farukh Iqbal. Rosero's loan application — prepared by Farukh — reflected that Rosero earned $14,000 per month as an operations manager at Horizon Mortgage. Her SunTrust loan file contained a W-2 form showing that Rosero had made $155,000 the previous year, and the file contained salary payment statements supporting those earnings. Those false documents bore the name of Ranjit Singh, who confirmed that the phony documents had been prepared by him. Rosero testified that her SunTrust loan application — and its supporting documents — misrepresented her employment and vastly overstated her income. Rosero also confirmed that she had not provided Farukh with the false information and fraudulent documents and had never met Singh.

In June 2006, a borrower named Leslie Lamas obtained $365,000 in mortgage loans from SunTrust to purchase a residential property in Annandale. A wire transfer of those loan proceeds from a SunTrust account in Atlanta to a bank in Fairfax, Virginia,

10

formed the basis for the wire fraud charge in Count 3 against Raza and Humaira Iqbal. Lamas obtained her loans from SunTrust with the assistance of Humaira, although Raza was the SunTrust loan officer identified on the Lamas loan application. The application reflected that Lamas earned $9,540 per month, and her SunTrust loan file contained a false earnings statement — prepared by Ranjit Singh — that corroborated her income. Lamas testified, however, that her income was not nearly that high when she obtained her SunTrust loans. Furthermore, she had not provided Humaira with any supporting documents to that effect.

In June 2006, Reynaldo Valdez obtained $414,000 in SunTrust mortgage loans to purchase a home in Fairfax. A wire transfer of those loan proceeds from a SunTrust account in Atlanta to a bank in Fairfax formed the basis of the wire fraud charge in Count 4 against Raza. Valdez's loan application at SunTrust — prepared and submitted with Raza's assistance — reflected that Valdez was a practicing dentist, that he earned $11,580 per month, and that he had $68,000 in the bank. His SunTrust loan file contained a bank statement and an earnings statement supporting those false assertions. Valdez confirmed at trial that he was not a dentist. He actually worked in his sister's medical office doing clerical and maintenance work. Valdez admitted that his SunTrust loan application vastly overstated his income and assets, and that he had not provided the false documents found in his SunTrust loan file. Those documents — a false earnings statement and a false W-2 form — had been prepared by Ranjit Singh.

In July 2006, a borrower named Harwinder Singh obtained $470,000 in SunTrust mortgage loans — in his wife's name — to purchase a residence in Ashburn, Virginia. A

11

wire transfer of those loan proceeds from a SunTrust account in Atlanta to a bank in Fairfax formed the basis for the wire fraud charge in Count 5 against Raza and Humaira Iqbal. Humaira — working with Raza — had assisted Harwinder Singh in completing the SunTrust loan application. Harwinder overstated his wife's income at the urging of Humaira and his realtor. The loan application reflected that Mrs. Singh worked as a systems engineer at Orberthur Systems, earned $14,825 per month, and had $45,000 in a Wachovia Bank. Her loan file contained earnings and bank statements corroborating those false numbers. Mrs. Singh was actually a quality technician at Orberthur Systems and earned only $25,000 per year. Harwinder Singh and his spouse had never banked with Wachovia, and neither of them gave Humaira any false documents.

In July 2006, Santos Valdez-Mejia obtained $405,000 in SunTrust mortgage loans on a residential property in Alexandria. A wire transfer of those loan proceeds from SunTrust in Atlanta to a bank in Fairfax formed the basis for the wire fraud charge in Count 6 against Raza. The Valdez-Mejia loan application, prepared for him by Raza, reflected that Valdez-Mejia earned $9,875 per month and that he worked as an area manager for a restaurant chain. His SunTrust loan file contained false earnings statements prepared by Ranjit Singh. When Valdez-Mejia applied for his SunTrust mortgage loans, he was actually working hourly wage jobs — as a cook and as a manual laborer. Valdez-Mejia confirmed at trial that his income was substantially less than $9,875 per month. He had never advised Raza that he worked as an area manager for a restaurant or that he earned such a monthly income.

12

In February 2007, Zahoor Hashmi obtained $387,000 in SunTrust loans to refinance a mortgage on an Alexandria residential property. A wire transfer of those loan proceeds from a SunTrust account in Atlanta to a bank in Fairfax formed the basis for the wire fraud charge in Count 7 against Raza and Haider. Hashmi had secured his initial mortgage loan in 2005 from another lender. He thereafter sought to refinance with SunTrust because he was behind on his bills. Hashmi's refinancing application — prepared by Haider — falsely indicated that Hashmi was vice-president of a business called AA Motors. Hashmi had never worked at AA Motors, and he had not told Haider otherwise. His SunTrust loan file contained a false pay stub prepared by Ranjit Singh.

c.

The prosecution presented additional conspiracy and fraud scheme evidence by calling several other former SunTrust borrowers. Francy Castillo had obtained mortgage loans from SunTrust in 2006. Her loan application — prepared by Raza — falsely reflected that Castillo was president of a company called NGDC, earned a monthly salary of $17,000, and had $100,000 in a Wachovia bank. Castillo confirmed at trial that, when she obtained her SunTrust loans, she was actually working two hourly jobs — as a waitress and as a caretaker. Castillo had never worked for NGDC, she earned substantially less than $17,000 per month, and she never had $100,000 in any bank.

Khalid Yousaf obtained a mortgage loan from SunTrust in 2005 and refinanced just a year later. Raza handled both of Yousaf's SunTrust loans. When he refinanced, Yousaf was working two jobs — driving a cab and operating a Dollar Store — and made about $3,000 per month. His refinancing application with SunTrust, however, reflected

13

that he was vice-president of a business called DPP Services and earned $13,000 per month. Yousaf had never heard of DPP Services, had never earned $13,000 per month, and had not told Raza otherwise.

Oscar Carrion testified that his wife made approximately $15,000 per year in 2006. Her SunTrust loan application — prepared by Raza — reflected that she earned nearly that much monthly. The loan application of Juan Pablo Yanez — prepared by Humaira — reflected that he was president of a construction company and earned more than $11,000 per month. Yanez was actually a laborer earning hourly wages. Jagtar Dhanoa's SunTrust loan application — prepared by Humaira — falsely indicated he was a senior analyst at Ikon Solutions. He was actually working as a Pizza Hut cook and as a cab driver.

d.

Barbara Daloia, a vice-president of SunTrust's national underwriting team in North Carolina, explained the potential consequences to SunTrust of loan applicants failing to submit accurate information on mortgage loan applications. As Daloia explained, SunTrust sometimes contracted with investment banks to sell its originated mortgage loans by way of secondary sales agreements. Pursuant thereto, SunTrust agreed to repurchase any such loans that failed to comply with its underwriting guidelines. Thus, if such a secondary market purchaser discovered that a SunTrust loan it had purchased had been procured by fraud, SunTrust was obliged to repurchase the fraudulent loan.

Furthermore, according to Daloia, if SunTrust sold a fraudulently procured loan and was not compelled to repurchase it, SunTrust was nevertheless exposed to the risk of default. Daloia had reviewed all the loan files used by the prosecution at trial. She explained that, on twelve of the properties, SunTrust had made two loans simultaneously — one for eighty percent of the property's value and the other for the remaining twenty percent. SunTrust would thus retain two separate liens on each of those properties, with a first lien being retained on the larger eighty percent loan. The second lien would be retained on the smaller loan. Daloia explained that SunTrust would sell only the larger loan — with the first lien — and would always hold for itself the smaller loan and the second lien. Thus, in the event of a sale, SunTrust would nevertheless be exposed to the risk of the smaller loan's default.

In sum, Daloia emphasized the significance to SunTrust of the information required on its loan applications. As she related to the jury,

> anything on the loan application is of importance, the loan amount, the borrower's name, their current address, the property type, whether it was a purchase or a refinance, if they owned any other properties. All of that is important on the application.

*See* J.A. 657. Daloia stressed that supporting documents were similarly important to SunTrust's loan process — such as those required for full document loans and stated income, stated asset loans — because those documents authenticate the information on the loan application.

15

## 2.

After the prosecution rested, the defense called three witnesses, seeking to show that the misrepresentations made on the SunTrust mortgage loan applications were not important to the bank's loan process. The defendants also sought to prove that the fraud scheme did not present any substantial risk of injury to SunTrust. None of the defendants testified.

Terri Dougherty, a former SunTrust underwriter, described what the defense called SunTrust's "originate-to-sell" mortgage business. Such a business model focused on new mortgage loans and deemphasized the collection of interest. According to Dougherty, SunTrust aggressively sought to originate mortgage loans in order to sell them on the secondary mortgage market. SunTrust attempted to sell loans immediately after origination, before the SunTrust borrowers could default and undermine the loans' marketability. Dougherty believed this business model encouraged SunTrust employees to prioritize economic metrics that attracted secondary loan purchasers — such as good credit scores of borrowers — and to disregard other information on the SunTrust loan applications. For example, Dougherty asserted that SunTrust discouraged its mortgage loan underwriters from raising red flags when loan applications contained questionable information concerning income, employment, and assets, so long as the borrowers' credit scores were adequate. Dougherty also maintained that SunTrust supervisors would sometimes override her decisions to defer action on loan applications and to request additional supporting documents.

16

The defense relied on an expert witness concerning the secondary mortgage market in an effort to bolster Dougherty's testimony. Robert MacLaverty opined that SunTrust's mid-Atlantic region had engaged in reckless lending practices and approved more than ninety-eight percent of its residential mortgage loan applications during the period of the fraud scheme. In contrast, SunTrust's competitors approved about eighty percent of similar loan applications during that period. MacLaverty believed that secondary market purchasers deemed credit scores of borrowers to be one of the most important economic metrics in their evaluations of loan acquisitions. MacLaverty further opined that SunTrust's pattern of expeditiously selling originated loans to secondary market purchasers minimized SunTrust's exposure to the risk of borrowers defaulting on SunTrust loans.

3.

After the parties rested and made their closing arguments, the district court instructed the jury. Several of the instructions were contested. The jury was required to find that — as part of the scheme to defraud — the defendants had made and caused to be made materially false statements and representations to SunTrust. The defendants sought to have the court define material false statements in a subjective manner. They argued unsuccessfully for an instruction that a materially false statement was one that "would have a natural tendency to influence or be capable of influencing a decision of the particular decisionmaker to whom it is addressed — here, the decision of SunTrust to approve and fund mortgages for the properties named in the indictment." *See* J.A. 191. The prosecution's proposed materiality instruction, on the other hand, was drawn in an

17

objective context, explaining that a "statement or representation is 'material' if it has a natural tendency to influence or is capable of influencing a decision or action." *See id.* at 153. The court rejected the defendants' materiality instruction and defined materiality in a manner similar to that proposed by the prosecution.

C.

On February 3, 2016 — after three days of deliberations — the jury returned its verdict. The jury convicted each of the defendants on Count 1, which charged conspiracy to commit wire fraud. As for the wire fraud offenses, the jury convicted Raza on three of six charges. That is, Raza was convicted on Counts 3, 4, and 6. Humaira was convicted on Count 3. Both Farukh and Haider were convicted of a single wire fraud offense — Farukh on Count 2 and Haider on Count 7. The court sentenced Raza to twenty-four months in prison, Humaira Iqbal to fifteen months, and both Farukh Iqbal and Haider to a year and a day. The defendants thereafter noted these appeals. We possess jurisdiction pursuant to 28 U.S.C. § 1291. The defendants have been granted bond pending appeal.

In their appeals, the defendants jointly present three issues concerning the jury instructions. They first maintain that the court committed reversible error on two aspects of the wire fraud offense, that is, materiality and intent to defraud. The defendants also contend that the court abused its discretion by failing to instruct the jury prior to deliberations that it had to individually assess the guilt of each defendant as to each count. No other issues concerning the conduct of the trial or the propriety of the sentences are presented.

18

## II.

We review de novo an appellate contention "that a jury instruction failed to correctly state the applicable law." *See United States v. Jefferson*, 674 F.3d 332, 351 (4th Cir. 2012). In assessing the propriety of instructions, however, "we do not view a single instruction in isolation." *See United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996). We are obligated to "consider whether taken as a whole and in the context of the entire charge, the instructions accurately and fairly state the controlling law." *Id.* If an instruction on an offense element is improper, and if an objection was preserved, we review for harmless error. *See Neder v. United States*, 527 U.S. 1, 9 (1999).

A trial court's decision not to give a proposed instruction is reviewed for abuse of discretion and is reversible error only if it "(1) was correct, (2) was not substantially covered by the charge that the district court actually gave to the jury, and (3) involved some point so important that the failure to give the instruction seriously impaired the defendant's defense." *See United States v. Bartko*, 728 F.3d 327, 343 (4th Cir. 2013). We have emphasized that a party challenging "instructions faces a heavy burden, for we accord the district court much discretion to fashion the charge." *See Noel v. Artson*, 641 F.3d 580, 586 (4th Cir. 2011).

## III.

Prior to its deliberations in this trial, the district court instructed the jury that, in order to convict a defendant on a wire fraud offense, it was obliged to find five elements beyond a reasonable doubt. That is, the prosecution had to establish the following: (1)

19

the scheme to defraud; (2) the use of a wire communication in furtherance of the scheme; (3) a material statement or omission in furtherance of the scheme; (4) an intent to defraud; and (5) that the fraud scheme affected a financial institution.

By way of background, the federal courts have historically identified two statutory elements of a wire fraud offense. That is, such an offense can be proved if a defendant (1) devised or intended to devise a scheme to defraud, and (2) used a wire communication in furtherance of the scheme. *See* 18 U.S.C. § 1343. In 1999, the Supreme Court identified a common law element of materiality as applicable to mail, wire, and bank fraud offenses. *See Neder v. United States*, 527 U.S. 1, 25 (1999). Additionally, an intent to defraud has consistently been treated as an element of such fraud offenses. *See United States v. Wynn*, 684 F.3d 473, 478 (4th Cir. 2012) (explaining that scheme to defraud necessarily requires proof of intent to defraud). Finally, a fifth element of the substantive wire fraud offenses in this case — that the fraud scheme affected a financial institution — is required under § 1343 of Title 18 and must be proved if a financial institution is the alleged victim. Pursuant to § 1343, proof that the wire fraud scheme affected a financial institution justifies enhanced punishments for the person convicted. Notably, the defendants proposed an instruction that the wire fraud offenses required proof of the five elements specified above, and the court tracked that instruction in its jury charge.

20

A.

1.

We review de novo the defendants' first contention of error, which is that the instructions failed to properly advise the jury that it had to find — on the third element of the wire fraud offense — that the defendants' misrepresentations and false statements were subjectively material to the fraud's victim, i.e., SunTrust. The defendants thus maintain that the court erroneously gave the jury an objective — or "reasonable lender" — standard of materiality. The court instructed the jury on the materiality element in the following terms:

- The government was obliged to prove that "the scheme or artifice to defraud, or the pretenses, representations, or promises, were material; that is, they would reasonably influence a person to part with money or property." *See* J.A. 1313.

- A particular fact is material if it "may be of importance to a reasonable person in making a decision about a particular matter or transaction." *Id.* at 1315.

- "A statement or representation is material if it has a natural tendency to influence or is capable of influencing a decision or action." *Id.* at 1318.

Based on those instructions, the defendants argue that the jury could have convicted them on the basis of false statements that an objective, reasonable lender might have considered material, but that SunTrust itself did not deem to be material in the circumstances.

The defendants support their contention of error with several court decisions that assess materiality in the fraud context. For example, in *Neder*, the Supreme Court

21

concluded — in the context of a tax fraud prosecution — that to be material a false statement must be "capable of influencing[] the decision of the decisionmaking body to which it is addressed." *See* 527 U.S. at 16. In a similar vein, we have determined, in the context of fraud against a county government, that "[t]he test for materiality of a false statement is whether the statement has a natural tendency to influence, or is capable of influencing its target." *See Wynn*, 684 F.3d at 479. The defendants contend on appeal — and argued at trial — that those decisions required that the jury be instructed on a subjective standard of materiality.

Although the federal courts have generally applied an objective test to the materiality element in fraud schemes targeting private lenders, the defendants argue that a recent Supreme Court decision — post-dating this trial — clarified the applicable standard in their favor. More specifically, they contend that the Court, in *Universal Health Services v. United States ex rel. Escobar*, confirmed that the applicable test is subjective for materiality in a fraud prosecution such as theirs. *See* 136 S. Ct. 1989 (2016). As the Court stated therein, "[u]nder any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *See id.* at 2002 (quoting 26 Richard A. Lord, *Williston on Contracts* § 69:12, at 549 (4th ed. 2003)).

Finally, the defendants contend that the trial court's instructional error on the materiality element was prejudicial and that they were thereby denied a fair trial. They argue that materiality was the "core issue at trial," and that the prosecution failed to prove that the misrepresentations made in the SunTrust loan applications had actually

22

influenced SunTrust. They point in particular to the evidence of witnesses Dougherty and MacLaverty, who opined that SunTrust had engaged in reckless lending practices and disregarded false information in loan applications. As a consequence, according to the defendants, they would not have been convicted of wire fraud if the jury had been properly instructed on the materiality element.

2.

The government counters that the trial court did not err in its materiality instructions and that the jury was advised of the applicable legal principles. The prosecutors contend that the Supreme Court and the courts of appeals — consistent with the instructions here — have endorsed an objective test of materiality for lender fraud such as that underlying this prosecution. In *Neder*, for example, the Supreme Court endorsed an objective, reasonable person standard for materiality in the context of wire fraud against private lending institutions. *See* 527 U.S. at 22 n.5. Furthermore, we recently decided, in *United States v. Wolf*, that an objective test for materiality applies in the context of a bank fraud prosecution. *See* 860 F.3d 175, 193 (4th Cir. 2017). The government contends that we are bound by *Wolf*, which constitutes circuit precedent and which was was decided well after the *Universal Health* decision. The prosecutors therefore see *Wolf* as binding on the materiality issue.

The government also argues that *Universal Health* did not establish a subjective test for the materiality element in a wire fraud prosecution where a private lender is the victim. Although the government depends primarily on *Wolf*, it also relies on *Neder* and a recent Ninth Circuit decision that is consistent with *Wolf*. *See United States v. Lindsey*,

23

850 F.3d 1009 (9th Cir. 2017). The *Lindsey* decision — which also post-dates *Universal Health* — ruled that an objective test for materiality applies to a wire fraud scheme targeting a private lender. *Id.* at 1014-17. Finally, the government contends that, if the district court somehow erred on the materiality element, the error was harmless.

3.

a.

We begin our discussion of the materiality element with the Supreme Court's 1999 decision in *Neder*. There, the defendant had been convicted of offenses that included tax, mail, wire, and bank fraud. *See Neder*, 527 U.S. at 1. The Court therefore had to address materiality-related questions concerning several types of fraud, but separated its analysis into two primary parts. *Id.* at 7-26. First, it discussed the tax fraud scheme in that prosecution, which had targeted the federal government. *Id.* at 7-20. Second, the Court addressed the mail, wire, and bank fraud schemes, which had victimized private lenders. *Id.* at 20-26. The Court then identified different standards of materiality for those two categories of fraud. *Id.* at 16, 22 n.5. Pursuant to *Neder*, the test for materiality in a fraud scheme targeting the federal government verges toward the subjective. *Id.* at 16. A fraud scheme targeting a private lender, on the other hand, is measured by an objective standard. *Id.* at 22 n.5.

The *Neder* Court first assessed whether it could sustain the tax fraud convictions where the prosecution had proven that the defendant falsely stated his income on his federal returns. *See* 527 U.S. at 7-20. That aspect of the case concerned, inter alia, whether the trial court's error in failing to submit the materiality issue to the jury was

24

harmless. *Id.* at 15-20. In conducting that analysis, the Court made its formulation of materiality when the federal government is a target, explaining that "a false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it is addressed." *Id.* at 16 (internal quotation marks omitted).

The *Neder* materiality standard — emphasizing that the false statement must be capable of influencing the decisionmaking body to which it is addressed — is derived from earlier decisions assessing materiality issues in fraud schemes that targeted the federal government. The most notable was *Kungys v. United States*, where the Court addressed a materiality element in a denaturalization proceeding. *See* 485 U.S. 759, 769-70 (1988). The applicable statute provided that the citizenship of a naturalized citizen could be revoked if naturalization had been procured by, inter alia, the "concealment of a material fact." *See* 8 U.S.C. § 1451(a). The *Kungys* Court recognized that the federal courts had reached a "uniform understanding of the 'materiality' concept" in the context of "federal statutes criminalizing false statements to *public officials*." *See* 485 U.S. at 770 (emphasis added). The uniform understanding was that "a concealment or misrepresentation is material if it has a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body to which it was addressed." *Id*. *Kungys* ruled that "the test of whether [the defendant's] concealments or misrepresentations were material is whether they had a natural tendency to influence the decisions of the *Immigration and Naturalization Service*." *Id.* at 772 (emphasis added).

25

The applications of *Kungys* in subsequent decisions plainly show that a more focused materiality test applies to fraud schemes that target the federal government and public officials. *Cf. Shaw v. United States*, 137 S. Ct. 462, 468 (2016) (emphasizing that "crimes of fraud targeting the Government" constitute "an area of the law with its own special rules and protections"). More precisely, when the victim is the government, the prosecution must prove materiality by reference to the particular government agency or public officials that were targeted. *See, e.g.*, *United States v. Camick*, 796 F.3d 1206, 1217-19 (10th Cir. 2015) (reversing fraud convictions because false statements were immaterial to public decisionmaking bodies); *United States v. Litvak*, 808 F.3d 160, 174 (2d Cir. 2015) (vacating false statement conviction because prosecution failed to prove that misstatement was capable of influencing Treasury decision). Thus, even if the false representation might influence a reasonable person, a fraud conviction was not warranted unless the governmental decisionmaking body considered the false representation to be material. *See United States v. Ismail*, 97 F.3d 50 (4th Cir. 1996).

In our *Ismail* decision, for example, we were called upon to assess the validity of a conviction under 18 U.S.C. § 1001, involving false statements made to the FDIC as part of a scheme to defraud the government. *See* 97 F.3d at 52-55. The defendant argued that his statements — use of a false name and a fictitious social security number — were immaterial to the FDIC. *Id.* at 60-61. In vacating his conviction, we acknowledged that "[p]roviding a false name or social security number certainly could, in a given situation, be material." *Id.* at 60. We explained, however, that the prosecution had failed to present

any evidence bearing on the materiality of the false statements made to the FDIC. *Id.* As a result, Ismail was entitled to a judgment of acquittal. *Id.* at 62.

b.

Although the materiality test identified by the Supreme Court in *Kungys* is arguably subjective, it does not apply to a fraud scheme that targets a private lender such as SunTrust. In assessing the second type of fraud discussed in *Neder* — fraud schemes that target private banks and lenders — the crucial issue was whether the prosecution must prove materiality as an element of the offenses of mail, wire, or bank fraud. *See* 527 U.S. at 20. In determining that Congress intended to incorporate common law materiality principles into those offenses, the *Neder* Court relied on the objective materiality test spelled out in the Second Restatement of Torts. *Id.* at 22 n.5. As explained therein, a fact is material if a "reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Id.* (quoting Restatement (Second) of Torts § 538 (1977)).[7]

Consistent with *Neder*, our *Wolf* decision adhered to an objective standard of materiality for a criminal fraud offense that targeted a private lender. *See Wolf*, 860 F.3d at 193-96. Wolf was convicted, inter alia, of bank fraud in violation of 18 U.S.C. § 1344. *Id.* at 179. He challenged evidence sufficiency, arguing that the prosecution had failed to

---

[7] Notably, the *Neder* Court declined to incorporate the common law elements of reliance and damages into the mail, wire, and bank fraud offenses. *See* 527 U.S. at 24-25. Requiring proof of those elements would have required proof of more than objective materiality, that is, proof that the misrepresentations actually influenced and harmed the target.

27

prove that his false statements and representations were material to the lenders. *Id.* at 194. Judge Traxler's carefully crafted opinion rejected that proposition, explaining that the applicable "test for whether a false statement to a bank is material is an objective one; it does not change from bank to bank." *Id.* at 193. For that formulation, *Wolf* relied on a Tenth Circuit case, where the court had explained that "materiality in the bank fraud context [is] an *objective* quality, unconcerned with the subjective effect that a defendant's representations actually had upon the bank's decision." *See United States v. Irvin*, 682 F.3d 1254, 1267 (10th Cir. 2012). The *Wolf* decision thus applied an objective test to the materiality element, asking whether "Wolf's statements or representations would have been important to a reasonable lender." *See* 860 F.3d at 195. In ruling that the prosecution had presented sufficient evidence to prove materiality, *Wolf* explained that "the kinds of misrepresentations [the defendant] made during all of these transactions would have mattered greatly to any mortgage lender." *Id.* at 196.

More than fifteen years prior to *Wolf* — and post-*Neder* — our Court explained that frauds perpetrated on private lending institutions are judged according to an objective, "reasonable financial institution" standard. *See United States v. Colton*, 231 F.3d 890, 903 n.5 (4th Cir. 2000). In *Colton*, a jury had convicted the defendant on several counts of bank fraud after finding that he fraudulently obtained loans used to finance commercial real estate projects. *Id.* at 894. The prosecution presented evidence that Colton failed to disclose material information to the victimized financial institutions prior to the fraudulent transactions. *Id.* Colton challenged the prosecution's theory, maintaining, inter alia, that he had no independent duty to disclose the material

28

information to the victimized lenders. *Id.* He also asserted that one of the lenders failed to perform an adequate due diligence investigation prior to entering into a financing agreement. *Id.* at 903.

We rejected Colton's argument and affirmed his convictions, explaining that "the susceptibility of the victim of the fraud, in this case a financial institution, is irrelevant to the analysis." *See Colton*, 231 F.3d at 903; *see also United States v. Brien*, 617 F.2d 299, 311 (1st Cir. 1980) ("If a scheme to defraud has been or is intended to be devised, it makes no difference whether the persons the schemers intended to defraud are gullible or skeptical, dull or bright. These are criminal statutes, not tort concepts."). As our *Colton* decision explained, *Neder* had declined to incorporate common law elements of fraud that would require proof of the impact of a fraud scheme on its intended victims, namely "reliance" and "damages." *See Colton*, 231 F.3d at 903 (citing *Neder*, 527 U.S. at 24-25). Instead, the relevant elements of wire fraud are an intent to defraud and materiality, which *Colton* defined as "what a *reasonable financial institution* would want to know in negotiating a particular transaction." *Id.* at 903 n.5 (emphasis added).

Finally, in the *Lindsey* prosecution that was strikingly similar to this one, the Ninth Circuit reached the same conclusion we reached in *Wolf* and *Colton*. In *Lindsey*, the court of appeals assessed whether to affirm a bank loan officer's convictions of wire fraud after the jury found that the officer had fraudulently procured loans from private lenders. *See* 850 F.3d at 1012-19. The *Lindsey* prosecutors proved — as here — that the defendant used false income figures on mortgage loan applications. *Id.* at 1010. Lindsey argued that those false numbers were immaterial to the victim lenders, because those

29

lenders were routinely engaged in negligent lending practices and regularly disregarded materially false information on loan applications. *Id.* at 1012-14.

The Ninth Circuit rejected Lindsey's assertion that the behavior of the victimized lenders could be a defense for the defendants. *See Lindsey*, 850 F.3d at 1015. As the court explained, "[a] false statement is material if it *objectively* had a tendency to influence, or was capable of influencing, a lender to approve a loan." *Id.* (emphasis in original). This result was necessary because the materiality standard "is not concerned with a statement's subjective effect on the victim, but only the intrinsic capabilities of the false statement itself." *Id.* (internal quotation marks omitted).

The *Lindsey* court also acknowledged the broader context of lender misconduct in which that prosecution had occurred, and the court understood "the desire to see lenders shoulder responsibility for their role in the mortgage crisis of the last decade." *See* 850 F.3d at 1014. The opinion recognized, however, that adopting a subjective test of materiality would essentially grant blanket absolution to low-level fraudsters because of the widespread sins of the mortgage industry. *Id.* The court of appeals rejected that outcome, emphasizing that "[t]wo wrongs do not make a right, and lenders' negligence, or even intentional disregard, cannot excuse another's criminal fraud." *Id.*

c.

(i)

Notwithstanding the controlling import of our *Wolf* decision — and asking us to discount *Lindsey* — the defendants argue that *Wolf* was erroneously decided because it

30

conflicts with *Universal Health*.[8]   There, the Supreme Court was tasked with assessing materiality in the context of a qui tam proceeding against a healthcare facility.  *See Universal Health*, 136 S. Ct. at 2001-03.  The plaintiffs argued that, under the False Claims Act (the "FCA"), the healthcare facility had defrauded the government by falsely claiming that it was in compliance with state licensing requirements when it billed Medicaid.  *Id.* at 1993.  The FCA penalizes anyone who "knowingly presents . . . a false or fraudulent claim for payment or approval" to the federal government.  *See* 31 U.S.C. § 3729(a)(1)(A).  Furthermore, a qui tam plaintiff may state an actionable FCA claim if she alleges that "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement" is "material to the Government's payment decision."  *See Universal Health*, 136 S. Ct. at 2002.

In evaluating materiality in the FCA context, *Universal Health* explained that the federal statute itself defines materiality as having "a natural tendency to influence, or be[ing] capable of influencing, the payment or receipt of money or property."  *See* 31 U.S.C. § 3729(b)(4).  *Universal Health* acknowledged some similarities between the FCA's statutory definition of materiality and the definitions adopted by the Court in *Neder* and *Kungys*.  *See Universal Health*, 136 S. Ct. at 2002.  Explaining that the materiality requirement in *Kungys* "descends from common-law antecedents," the Court

---

[8] It bears noting that *Wolf* was decided by our Court a full year after the *Universal Health* decision was handed down by the Supreme Court.  For whatever reason, the defendants' contention in these appeals — that *Universal Health* altered our materiality analysis in the context of fraud schemes targeting lenders — was not presented in the *Wolf* appeal.

resolved that it "need not decide whether [the FCA's] materiality requirement is governed by [statute] or derived directly from the common law." *Id.* Instead, the Court explained, "Under any understanding of the concept, materiality 'looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'" *Id.* (internal quotation marks omitted).

The defendants' contention of error on the materiality element apparently comes to this: They want us to utilize *Universal Health* to rule that the Supreme Court has clarified its earlier cases to say that materiality — in any criminal fraud context — requires proof that the false statements and misrepresentations were subjectively material. For multiple reasons, we reject that invitation.

(ii)

First, to the extent *Universal Health* altered the concept of materiality in fraud proceedings, it is not likely that its impact extends beyond the context of qui tam actions. And a qui tam action is a civil proceeding that protects the federal government. The Court implicitly acknowledged that proposition in *Universal Health*, explaining that "[t]he [FCA's] materiality standard is demanding. The [FCA] is not an all-purpose antifraud statute." *See* 136 S. Ct. at 2003 (internal quotation marks omitted). We reached a similar conclusion recently in *United States v. Palin*. In the *Palin* fraud prosecution, several defendants had been convicted of health care fraud and conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1347 and 1349. *See* No. 16-4522, slip op. at 1 (4th Cir. Oct. 30, 2017). They appealed, arguing that "*Universal Health* established a new materiality standard that applies to all criminal fraud statutes, including

32

§ 1347." *Id.* at 7. Judge Motz's opinion expressed skepticism with that assertion, recognizing that the defendants sought to "stretch *Universal Health* too far." *Id.* at 8. Although *Palin* only had to decide whether *Universal Health* impacted the materiality element in the context of health care fraud, it specified that "[w]e do not believe the Supreme Court intended to broadly 'overrule' materiality standards that had previously applied in the context of criminal fraud." *Id.* We readily agree.

Second, if *Universal Health* controlled our decision on materiality in these appeals, it is unclear what the impact might be. After explaining for the unanimous Court in *Universal Health* that "[u]nder any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation," Justice Thomas emphasized that "[i]n tort law, for instance, a matter is material . . . if a reasonable man would attach importance to [it] in determining his choice of action in the transaction in question." *See* 136 S. Ct. at 2002-03 (internal quotation marks omitted). The Court's juxtaposition of those two standards suggests that they are not in tension. Put another way, an objective test of materiality does in fact "look to the effect on the likely or actual behavior of the recipient." *See id.* at 2002. In those circumstances, however, the recipient is a "reasonable man . . . determining his choice of action in the transaction in question." *Id.* at 2002-03. Thus, in this prosecution, the recipient whose behavior the jury should assess in its materiality inquiry is a reasonable lender in SunTrust's position — not necessarily SunTrust itself.

Third, and perhaps most important, *Universal Health* involved a civil fraud scheme that had targeted the federal government. In such a circumstance, the applicable

materiality test verges toward a subjective standard. In *Universal Health*, for example, the Court suggested that evidence of a government entity's past disregard of particular types of false statements might undermine the materiality element. *See* 136 S. Ct. at 2003 ("[I]f the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material."). The *Lindsey* court recently explained why that principle does not apply when the fraud victim is a private lender:

> A single lender represents only some small part of the market for issuing mortgages. The Federal Government, by contrast, represents the entire market for issuing federal government contracts. The weight the Government gives to a particular statutory, regulatory, or contractual requirement is analogous not to the weight an individual lender gives to a statement on its loan application, but rather the weight the entire mortgage industry gives to that type of statement.

*See* 850 F.3d at 1017. The Ninth Circuit appears to have barred the evidentiary use of a lender's past lending practices on the materiality issue. In explaining that step, it related that "lending standards applied by an individual lender are poor evidence of a false statement's intrinsic ability to affect decision making." *Id.* at 1018. Although we need not go so far, we understand the rationale for the *Lindsey* court's wholesale rejection of such evidence.

d.

In view of the foregoing, the district court did not err in failing to require the misrepresentations in the SunTrust loan applications to be material to SunTrust as the fraud victim. In fact, the correct test for materiality — as the district court recognized — is an objective one, which measures a misrepresentation's capacity to influence an

34

objective "reasonable lender," not a renegade lender with a demonstrated habit of disregarding materially false information. In light thereof, the challenged instructions on the materiality element were not erroneous.[9]

## B.

## 1.

By way of their second contention of error, the defendants maintain that they are entitled to appellate relief because the district court erroneously instructed the jury on the element of intent to defraud. The court told the jury, inter alia, that it had to find that the defendants acted "knowingly and with the intention . . . to deceive or to cheat." *See* J.A. 1317. The defendants contend that the court's use of the disjunctive "or" in that instruction "erroneously allowed conviction for wire fraud based just on intent to deceive

---

[9] If the trial court somehow misstated the applicable principles concerning materiality, that error would be entirely harmless. The evidence established that certain types of loans required supporting documents verifying the various loan applicants' income, employment, and assets. The defendants went to great lengths to obtain those documents, seeking out and purchasing fraudulent W-2s and pay stubs from a reprobate tax preparer. The defendants then repeatedly mischaracterized the loan applicants' qualifications.

By way of example, Reynaldo Valdez walked into SunTrust's Annandale branch a custodian in a medical office, but left as a licensed medical professional. Jagtar Dhanoa understood that he cooked pizzas for Pizza Hut. He was identified on SunTrust loan documents as a "senior analyst" at Ikon Solutions. The defendants ask us to believe that those ludicrous misrepresentations are meaningless, i.e., that SunTrust would have funded Valdez's and Dhanoa's loans in any event. If that were the case, why make such misrepresentations? Why surreptitiously purchase and submit fraudulent documents? Barbara Daloia, who stressed the importance of accurate information being reflected on all loan applications, confirmed the obvious. SunTrust would not have funded the loans had the defendants painted an accurate picture of the applicants' qualifications.

without an intent to deprive SunTrust of anything of value." *See* Br. of Appellants 19. The defendants argue that this error was also prejudicial, in that a properly instructed jury would have found them not guilty, because there was little or no risk to SunTrust if the loans went into default.

2.

The government counters that the intent to defraud instructions — viewed in context — adequately advised the jury that it had to find that the defendants intended to deprive SunTrust of something of value. They point to aspects of the court's charge that indicated the scheme had to entail losses to SunTrust. For example, the jury was advised that it had to find that the defendants' false statements "would reasonably influence a person to part with money or property." *See* J.A. 1313. The prosecution was required to prove that the fraud scheme was a "deliberate plan of action or course of conduct by which someone intends to deceive or to cheat another or by which someone intends to deprive another of something of value." *Id.* at 1314. And the jury had to find that the defendants acted with the "specific intent" to defraud, i.e., "with the bad purpose either to disobey or disregard the law." *Id.* at 1318.

If the trial court somehow erred in its intent instructions, however, the government again asserts that the error was harmless. As the prosecution emphasizes, the "entire case was about the defendants submitting false loan applications and supporting documents on behalf of clients to obtain mortgage loans. There was no evidence of an intent to deceive [SunTrust] for any other purpose." *See* Br. of Appellee 45-46.

36

3.

Because the defendants maintain that the applicable law was erroneously set forth in the intent instructions, our review is de novo. We addressed a similar contention in *Wynn*, the case on which the defendants primarily rely. The trial court in *Wynn* had instructed that the intent element required a "specific intent to deceive or cheat someone, usually for personal financial gain or to cause financial loss to someone." *See* 684 F.3d at 477. The defendant took umbrage on appeal with the word "usually," arguing that its use allowed the jury to convict based solely on an intent to deceive the victim. *Id.* He maintained that the intent instruction was fatally erroneous because the prosecutors had to show more than "mere deception." *Id.* The government had to prove, Wynn argued on appeal, both intent to deceive and intent to harm. *Id.*

We agreed that the government had to prove more than mere deception. As Judge Niemeyer's opinion explained, "[t]o be convicted of . . . wire fraud, a defendant must specifically intend to lie or cheat or misrepresent with the design of depriving the victim of something of value." *See Wynn*, 684 F.3d at 478. The *Wynn* decision carefully evaluated the pertinent instructions, which had explicitly advised that the jury had to find the defendant "acted with the intent to defraud." *Id.* The trial court had also instructed that a "scheme to defraud includes any plans or course of action intended to deceive or cheat someone out of money or property," and that intent to defraud means "the specific intent to deceive or cheat someone, usually for personal financial gain or to cause financial loss to someone else." *Id.*

37

On those instructions, viewed in the proper light, our *Wynn* decision explained that the court's charge was correct, i.e., it did not permit the jury to find intent proved solely by an intent to deceive. *See* 684 F.3d at 478-79. The term "usually" explained motivation. *Id.* at 478. It "did not withdraw the instruction to the jury that the scheme to defraud *must* 'include a plan or course of action intended to deceive or cheat someone out of money or property.'" *Id.* That instruction, we explained, obviously conveyed "an intent to harm in some sense." *Id.*

As in *Wynn*, the intent instructions used by the trial court — viewed as a whole and in context — plainly conveyed to the jury that it had to find more than a mere intent to deceive SunTrust. *See United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996) (explaining that specific instructions should not be viewed in isolation). To commit wire fraud, the defendants had to engage in a scheme to defraud, which is "a deliberate plan . . . by which someone intends to deceive or to cheat another or by which someone intends to deprive another of something of value." *See* J.A. 1314. Notably, the instructions on intent to defraud substantially tracked those that we had approved four years earlier in *Wynn*. *See* 684 F.3d at 478. And, in any event, "a trial court has considerable discretion in choosing the specific wording of its instructions." *See United States v. Hager*, 721 F.3d 167, 185 (4th Cir. 2013). In these circumstances, we are

content to reject the contention that the court erred with respect to the intent to defraud instructions.[10]

## C.

### 1.

Finally, the defendants contend that the trial court abused its discretion by failing to instruct the jury prior to the deliberations that it was obliged to "give separate and individual consideration to each charge against each defendant." *See* J.A. 210. As proposed by the defendants, that instruction would have explained that "[t]he fact that you find one defendant guilty or not guilty of one of the offenses charged should not control your verdict as to any other offense charged against that defendant or against any other defendant." *Id.* The defendants argue that, in failing to so instruct, the court permitted the jury to find guilt by association.

### 2.

In response, the government does not say that the proposed instruction was erroneous. It maintains that the substance of the proposal was covered by the trial court's

---

[10] We also agree with the prosecution that, if the trial court's intent instructions could somehow be deemed erroneous, the error was harmless. On this evidence, the defendants had repeatedly engaged in underhanded tactics to hoodwink SunTrust underwriters into approving falsified loan applications. The defendants were thereafter rewarded for their deception by the commissions that SunTrust paid. The defendants ask us to ignore their efforts to deceive SunTrust and to instead focus on SunTrust's business model. If we were inclined to indulge the defendants' misdirection — and we are not — the witness Daloia refuted the allegation that SunTrust was insulated from harm if the fraudulent loans went into default. Because of the guilty verdicts, that explanation was necessarily accepted by the jury.

charge, both prior to and during the deliberations. Notably, the court instructed the jury in the charge — in words that refute the defendants' contention of error — that the "verdict must be unanimous on each count as to each defendant." *See* J.A. 1330. The court further explained that the jury would receive "a verdict form for each defendant," and pursuant thereto had to reach and return a "not guilty or guilty" verdict on each charge as to each defendant. *Id.*

During the deliberations, the jury sent the court a note that said: "According to the judge's instructions, if we find the Defendants guilty of [conspiracy to commit wire fraud], is guilt assumed for all other counts?" *See* J.A. 1364. The court responded — with the prior approval of the lawyers — as follows:

> As to your question, the answer is no. That if you find the Defendants guilty [of conspiracy to commit wire fraud], guilt is not assumed for all counts. You have to look at each and every count for each and every defendant in accordance with the instructions that I gave you and reach an individual verdict on each and every one of the counts.

*Id.* at 1351. The defendants argue that the supplemental instruction was not sufficient because it was given after the deliberations had begun and the jury had already agreed on its verdicts. The government rejects that assertion, emphasizing that the jury had certainly not agreed on verdicts when the note was sent — as evidenced by the fact that the jury had thereafter sought even more guidance from the court. *See id.* at 1365.

3.

We agree with the government that the instructions adequately covered the defendants' proposed instruction concerning the jury's duty to give individual consideration to each offense alleged. *See United States v. Bartko*, 728 F.3d 327, 343

40

(4th Cir. 2013) (explaining there is no abuse of discretion where jury charge "substantially covered" rejected instruction). More specifically, the jury was told that the verdict had to be "unanimous on each count as to each defendant." *See* J.A. 1330. That directive was supported by the verdict forms themselves, along with the supplemental instruction given during the deliberations. Notably, a separate verdict form was provided to the jury for each defendant, with the separate counts against each defendant listed thereon, thus requiring a separate verdict on each count. And as the completed verdict forms clearly demonstrate, the jurors acted precisely as the trial court directed. *Id.* at 1366-69. For example, Raza was acquitted on three of the seven counts reflected on his verdict form, and his wife Humaira Iqbal was acquitted on one of the three charges lodged against her. The jurors were unquestionably careful and conscientious in the performance of their exceedingly important duties. Finally, the jurors confirmed the accuracy of each of the verdicts — unanimously — in open court. *Id.* at 1358. In these circumstances, we are satisfied that the trial court did not err in failing to give the defendants' proposed instruction.

IV.

Pursuant to the foregoing, we are obliged to sustain the convictions of each defendant and affirm the judgments of the district court.

*AFFIRMED*